**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Robbin Lee COLEMAN,
Defendant-Appellant.**

No. 81–1644.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Oct. 4, 1982.

Decided May 16, 1983.

without oral argument. F.R.App.P. 34(a), Ninth Circuit Rule 3(a).

Thomas M. Coffin, Asst. U.S. Atty., Eugene, Or., for plaintiff-appellee.

James S. Coon, Portland, Or., for defendant-appellant.

Before WALLACE, FARRIS and POOLE, Circuit Judges.

WALLACE, Circuit Judge:

Coleman appeals his conviction on nine counts arising out of a conspiracy to murder Jeffrey Payne and recover the proceeds from fraudulently obtained life insurance policies on Payne's life. One count charged a conspiracy to commit mail fraud, and four counts involved mail fraud under 18 U.S.C.

§ 1341. The remaining counts involved the National Firearms Act, 26 U.S.C. §§ 4181, 4182, 5801–5872: two counts of making a destructive device without complying with the statutory registration requirements under 26 U.S.C. §§ 5822, 5861(f), and 5871; and two counts of transferring a destructive device without complying with statutory registration requirements under 26 U.S.C. §§ 5812, 5861(e), and 5871. On appeal, Coleman claims that certain acts and omissions by his trial lawyer amounted to ineffective assistance of counsel, and that the separate sentences for making and transferring a destructive device constituted an illegal multiple punishment under the National Firearms Act. We affirm.

I

This case involves a conspiracy between Coleman and Janice Payne to insure the life of Janice's husband, Jeffrey, naming Janice as the beneficiary, and then to murder him and collect the proceeds of the policies. Between October and December 1978, Janice Payne obtained various life insurance policies on her husband without his knowledge. Coleman forged Jeffrey's signature on the applications. Coleman agreed to share part of the insurance proceeds with Nuess and Zastera if they would murder Jeffrey.

Coleman made two Molotov cocktail firebombs on March 4, 1979. On March 18, he gave the bombs to Nuess and Zastera and instructed them to kill Payne and his partner, Harry Mallon, while they were working at a mine. Coleman also armed Nuess and Zastera with a rifle and a pistol and told them to shoot Payne and Mallon if the bombs missed.

Later that day, Zastera threw the firebombs at Payne and Mallon as they emerged from the mine. Both were injured but managed to escape into the forest as Zastera unsuccessfully emptied his revolver at them.

In return for immunity, Nuess agreed to cooperate and was outfitted with a hidden recorder. In recorded conversations with Nuess, Coleman admitted planning the attempted murders, admitted signing Payne's name on one of the insurance policies, and stated that he also intended to kill Janice Payne to collect her insurance had the attack on Jeffrey been successful.

II

■ Coleman's first argument is that the registration requirements of the National Firearms Act operated in this case to deny him his fifth amendment right against self-incrimination. Such a fifth amendment objection must be timely raised during trial or it may not be asserted on appeal. *United States v. Williams*, 427 F.2d 1031, 1033–34 (9th Cir.) (fifth amendment objection to the National Firearms Act must be raised during trial), *cert. denied*, 400 U.S. 909, 91 S.Ct. 153, 27 L.Ed.2d 148 (1970).

■ Coleman concedes that the fifth amendment objection was not raised during trial, but seeks to assert the issue on appeal by claiming that he was denied effective assistance of counsel. Under *Cooper v. Fitzharris*, 586 F.2d 1325 (9th Cir.1978) (en banc), *cert. denied*, 440 U.S. 974, 99 S.Ct. 1542, 59 L.Ed.2d 793 (1979), Coleman must show that his counsel's error reflected a failure to exercise the skill, judgment, or diligence of a reasonably competent defense attorney and that any specific acts or omissions were prejudicial to him. *Id.* at 1330–31. Coleman argues that an assertion of his fifth amendment privilege would have been a complete defense to the National Firearms Act charges. Thus, he contends, a reasonably competent attorney would have made the objection and its omission was clearly prejudicial to his case. We turn first to the merits of Coleman's fifth amendment claim.

His argument is an unusual one. He contends that compliance with the registration requirements of the National Firearms Act in connection with the making and transferring of the Molotov cocktail would have incriminated him for various acts of mail fraud that occurred after the making of the bomb. To follow his reasoning, it is first necessary to review the history of the National Firearms Act and the resultant fifth amendment difficulties.

In *Haynes v. United States*, 390 U.S. 85, 88 S.Ct. 722, 19 L.Ed.2d 923 (1968), the Supreme Court struck down a provision of an earlier version of the National Firearms Act as violative of the fifth amendment. Essentially, the old law required registration by a person who possessed a firearm that was made or acquired in violation of the Act. The Court held that the fifth amendment prohibited Congress from requiring an individual to provide information that amounts to an admission of guilt to a state or federal crime. *Id.* at 96–100, 88 S.Ct. at 729–732.

Subsequent to *Haynes*, Congress amended the statute to state that no information or evidence provided in compliance with the registration or transfer provisions of the Act could be used, directly or indirectly, as evidence against the registrant or applicant "in a criminal proceeding with respect to a violation of law occurring prior to or concurrently with the filing of the application or registration, or the compiling of the records containing the information or evidence." 26 U.S.C. § 5848(a). Because the registration information could not be used to convict an applicant of any federal crime committed prior to or concurrent with his filing, and because the information contained in the registration would not be disclosed to state law enforcement agencies, the revised statute was upheld by the Supreme Court in *United States v. Freed*, 401 U.S. 601, 606, 91 S.Ct. 1112, 1116, 28 L.Ed.2d 356 (1971).

Coleman does not contend that the registration provisions are unconstitutional because they require him to incriminate himself on the charges relating to the National Firearms Act. Coleman also acknowledges that the fifth amendment cannot be used to shield him from liability for future crimes. Instead, Coleman contends that the registration requirements are unconstitutional as applied to him because they forced him to incriminate himself as to future acts for which his past acts make him criminally liable.

Essentially, Coleman's argument is as follows. He entered into the mail fraud conspiracy prior to the March 4 making and the March 18 transferring of the Molotov cocktails. However, acts committed by other members of the conspiracy, constituting violations of the mail fraud statute, occurred after the March 4 and March 18 dates.[1] As a conspirator, Coleman would be criminally liable for these subsequent acts by co-conspirators. Thus, although registering the bomb would not have subjected him to liability for the acts prior to registration, Coleman would be liable as a member of a conspiracy for subsequent mail fraud acts of co-conspirators. In essence, Coleman states that he would be forced to give the government evidence (making and transfer of the bombs) that could be used to prosecute him on the later occurring mail fraud acts. Thus, he contends that Congress's revision of the Act does not obviate his fifth amendment claim. He contends he was forced to incriminate himself for future crimes for which he is liable based on his past acts. Moreover, he claims that his case does not involve a "career of crime about to be launched," *see id.* at 606–07, 91 S.Ct. at 1116–1117, but liability based on acts already launched.

■ We have great difficulty with his reasoning. It is not clear that the government would have been able to use the registration information to convict Coleman of the acts committed by others after the making of the bombs. If the conspiracy was formed prior to the registration, the government would be precluded from using the registration information to convict him of the conspiracy.

But more importantly, Coleman's argument appears to conflict with the Supreme Court's teaching in *Freed* concerning the scope of the fifth amendment. *See id.* The fifth amendment is not a partner in prospective criminal acts. To adopt Coleman's interpretation of the fifth amendment

1. Coleman points out that Janice Payne mailed one of the premiums on March 5. Other illegal acts were also committed by Nuess and Zast-

era after the transfer on the 18th, although it is not clear that any of them would amount to a violation of federal law.

would mean that any deceptive practices committed as part of a larger criminal scheme would be subject to the self-incrimination clause of the fifth amendment. For example, as the government argues, a person applying for a bank loan for the purpose of buying heroin could claim that a law requiring him to disclose his purpose for wanting the loan would violate the fifth amendment. If he complied with the law and stated his reasons for the loan, under Coleman's theory this evidence could not be used to convict him of subsequent crimes, including ones for which he is liable as a member of a conspiracy. No precedent has been cited to us for such an interpretation of the fifth amendment.

■ Thus, we cannot say that a reasonably competent attorney would have made the argument advanced here by Coleman, or that the failure to make the argument prejudiced him in any way. Therefore, Coleman was not denied effective assistance of counsel as to the self-incrimination claim.

Coleman continues his lack of effective assistance of counsel argument by contending that his counsel improperly allowed the complete playing of a tape in which Coleman admits his role in the crime. He also points to instances in which counsel failed to object to hearsay testimony and failed to object to nonresponsive, rambling answers.

■ In testing whether Coleman received effective assistance, we apply the rule that attorneys are allowed wide discretion in the use of trial tactics. *United States v. Larios,* 640 F.2d 938, 941 (9th Cir.1981). In addition, in cases with overwhelming evidence of guilt, it is especially difficult to show prejudice from a claimed error on the part of trial counsel. *United States v. Hearst,* 638 F.2d 1190, 1194 (9th Cir.1980), *cert. denied,* 451 U.S. 938, 101 S.Ct. 2018, 68 L.Ed.2d 325 (1981). Under these standards, Coleman does not sustain his burden of showing that his sixth amendment rights were violated.

■ The tape in question contained admissible but very damaging statements made by Coleman as to his role in the crime. Other damaging statements contained in the tape, such as evidence of Coleman's criminal activities outside of this case, would have been inadmissible. The government offered an edited version of the tape. Coleman's counsel insisted that the entire three-hour tape should be played. Although it is unclear from the record exactly why he chose to do this, we may surmise that he thought the length of the tape would soften the critical admissions contained therein. The choice was one involving trial strategy and tactics. Based upon this record and given the overwhelming evidence against Coleman, it is difficult to find a sixth amendment violation by his attorney for strategy he employed to lessen the effect of damaging evidence. Furthermore, even if we were to consider counsel's conduct to be inadequate, Coleman cannot establish that he was prejudiced. Coleman admits in the tape that he was directly involved in the attempted murder, and two immunized witnesses testified to the same effect. The extra damaging evidence contained in the tape did nothing more than reinforce what had already been effectively proven.

The only other objection Coleman makes which has any merit is that his counsel failed to object to hearsay testimony of Nuess. However, the testimony was of relatively minimal significance in the totality of the trial.

■ Coleman fails to meet either prong of the *Cooper v. Fitzharris* test. We agree with Coleman that, in considering the effectiveness of trial counsel, we must not look only at each error separately, but must evaluate the cumulative impact of all the trial errors. *Cooper v. Fitzharris, supra,* 586 F.2d at 1333. Nevertheless, we cannot say that the cumulative impact of trial counsel's errors was sufficient to amount to ineffective assistance of counsel. Nor can we conclude that the requisite prejudice has been demonstrated.

III

■ Coleman contends that the district court erred in sentencing him consecutively

for making and transferring the same destructive device under 26 U.S.C. § 5861(e) and (f). He claims that the making and transfer of the Molotov cocktail were part of the same act or transaction, and that there is no evidence that Congress, in enacting these two subsections, intended to create multiple punishments for a single transaction. Although both the Fourth and Eighth Circuits have upheld multiple sentencing under subsections (e) and (f), *see United States v. Kiliyan,* 504 F.2d 1153 (8th Cir.1974), *cert. denied,* 420 U.S. 949, 95 S.Ct. 1333, 43 L.Ed.2d 428 (1975) (*Kiliyan*); *United States v. Kaplan,* 588 F.2d 71 (4th Cir. 1978), *modified on other grounds, United States v. Seidel,* 620 F.2d 1006 (4th Cir.1980) (*Kaplan*), we have never decided the issue in this circuit.

We first addressed the issue of multiple sentencing for violations of different provisions of the National Firearms Act in *United States v. Clements,* 471 F.2d 1253 (9th Cir.1972) (*Clements*). There we stated that:

> Unless we can find from the face of the Act or from its legislative history a clear indication that Congress intended to authorize multiple punishments for a *single transaction,* we are obliged to construe the Act against the harsher penalties that result from cumulative punishments.

*Id.* at 1254 (emphasis added). In that case, the defendant had been convicted of subsections (c), (d), and (f) of section 5861, which prohibit the possession of a firearm without paying the tax, possession of an unregistered firearm, and making of a firearm without paying the tax. We held that the defendant had engaged in a single transaction because "possession is always incidental to making by a person who is the maker." *Id.* It is impossible to make a gun and not possess it. Thus, by engaging in a single act, the defendant violated more than one provision of the statute. We concluded that without evidence of congressional in-

tent to impose multiple punishments, such a single act was subject to the ten-year sentence limitation for a violation of the National Firearms Act as set out in 26 U.S.C. § 5871.[2]

We have since followed *Clements* several times and have refused to uphold multiple punishments based on a single transaction which violated more than one provision of section 5861. *See United States v. Edick,* 603 F.2d 772, 774 (9th Cir.1979) (violations of (d) and (i), the possession of an unregistered gun and possession of the same gun not identified by a serial number); *United States v. Rone,* 598 F.2d 564, 572 (9th Cir. 1979) (same), *cert. denied,* 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 780 (1980); *United States v. Kalama,* 549 F.2d 594, 597 (9th Cir.1976) (violation of (d) and (f), the possession and making provisions of the Act), *cert. denied,* 429 U.S. 1110, 97 S.Ct. 1147, 51 L.Ed.2d 564 (1977); *see also Brown v. United States,* 623 F.2d 54, 57–59 (9th Cir.1980) (violations of the Gun Control Act). The *Clements* rule has also been followed in other circuits. *Rollins v. United States,* 543 F.2d 574, 575 (5th Cir.1976); *United States v. Ackerson,* 502 F.2d 300, 305 (8th Cir. 1974), *vacated on other grounds,* 419 U.S. 1099, 95 S.Ct. 769, 42 L.Ed.2d 796 (1975); *United States v. Tankersley,* 492 F.2d 962, 969 (7th Cir.1974).

We have recently refined the *Clements* rule in *Edick v. United States, supra,* 603 F.2d at 773–75. There, we considered whether *Clements* prohibited consecutive sentences per se, or only those sentences that exceed the statutory ten-year maximum for each violation of the Act. Edick had received sentences of three and five years, to run consecutively, for violating subsections (d) and (i) of section 5861. *Id.* at 773. We held that *Clements* and its progeny "forbid[ ] the imposition of consecutive sentences for different counts arising from a single transaction violating different

---

**2.** 26 U.S.C. § 5871 states that: "Any person who violates or fails to comply with any provision of this chapter shall, upon conviction, be fined not more than $10,000, or be imprisoned

not more than ten years, or both, and shall become eligible for parole as the Board of Parole shall determine."

provisions of 26 U.S.C. § 5861, regardless of whether the aggregate of the sentences exceeds the statutory maximum." *Id.* at 774.[3]

Coleman argues that the imposition of consecutive ten-year sentences for violating subsections (e) and (f) of section 5861 contradicts both the general rule of *Clements* and the more specific refinement of that rule under *Edick.* The *Clements* rule applies, however, only when the "violations arose from one act." *United States v. Rone, supra,* 598 F.2d at 572; *Edick, supra,* 603 F.2d at 774. Thus, under either *Clements* or *Edick,* the question before us is whether making and transferring constitute a single act or transaction.

In *Kiliyan, supra,* the Eighth Circuit decided that making and transferring were two separate acts, and therefore consecutive sentencing was permissible. The court distinguished *Clements,* pointing out that possession was always incidental to making by the person who was the maker, and therefore the two offenses merged. Absent congressional intent, such a merger precluded multiple sentencing. The court went on to state: "Here, however, unlawful making and unlawful transfer are separate, non-merged offenses; transfer is *not* 'always incidental to making by the person who is the maker.'" 504 F.2d at 1155 (emphasis in original).

In *Kaplan, supra,* the Fourth Circuit arrived at the same conclusion. Again, the court approved of our holding in *Clements;* indeed, the Fourth Circuit struck down consecutive sentences based on violation of the making and possession provisions because the sentences exceeded the ten-year limit for a single violation. 588 F.2d at 74–75. However, the court did not apply the *Clements* doctrine to the making and transferring provisions: "The offenses of making and transferring an illegal firearm are separate and independent crimes, not inciden-

tal to one another, and permit separate sentences." *Id.* at 75.

As we have stated before, "[w]e think it prudential 'to maintain uniformity in the law among the circuits, wherever reasoned analysis will allow.'" *Pinetree Transportation Co. v. NLRB,* 686 F.2d 740, 744 (9th Cir.1982), *quoting Aldens, Inc. v. Miller,* 610 F.2d 538, 541 (8th Cir.1979), *cert. denied,* 446 U.S. 919, 100 S.Ct. 1853, 64 L.Ed.2d 272 (1980). Here, we agree with the reasoning of the other circuits. The two acts of making and transferring are clearly distinguishable and neither is incidental to the other. One can make a firearm without transferring it, or transfer the device without making it. The separate dangers involved are well illustrated by this case. The firebombs were made on March 4, but were not transferred until March 18. There was a possibility that the project would be abandoned within this two week period, especially since Coleman initially had difficulty securing the cooperation of Nuess to carry out his plan. When Coleman was finally successful, his transfer of the device substantially heightened the danger to the victims. Each act alone posed significant danger to the victims, but when the two were combined, the danger was greatly increased. This is not true of the cases like *Clements* in which a single act makes one liable under various provisions of the National Firearms Act.

AFFIRMED.

---

**3.** This refinement of *Clements* has been less well received by the other circuits. At least two courts have decided that consecutive sentencing based on a single act is permissible as long as the total sentence comes to less than ten years. *See United States v. Kaplan,* 588 F.2d 71, 74–75 & n. 3 (4th Cir.1978), *modified on other grounds, United States v. Seidel,* 620 F.2d 1006 (4th Cir.1980); *Rollins v. United States,* 543 F.2d 574, 575 (5th Cir.1976).