**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Gary MEZZANATTO, Defendant–**
**Appellant.**

No. 92–50261.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 2, 1993.

Decided July 7, 1993.

Mark R. Lippman, La Jolla, CA, for defendant-appellant.

Shane P. Harrigan, Asst. U.S. Atty., San Diego, CA, for plaintiff-appellee.

Before: WALLACE, Chief Judge,
SNEED and HALL, Circuit Judges.

SNEED, Circuit Judge:

Appellant challenges the district court's ruling allowing the prosecution to introduce statements he made during failed plea negotiations for impeachment purposes. We reverse the appellant's conviction and remand for a new trial.

## I.

### FACTS AND PRIOR PROCEEDINGS

Appellant Gary Mezzanatto was charged with possession of methamphetamine in violation of 21 U.S.C. § 841(a)(1). At Mezzanatto's request, the government held a plea bargaining meeting with him. Before the start of this meeting, the prosecutor informed Mezzanatto that any statements he made during the meeting could be used to impeach any inconsistent testimony he offered at trial, if the case proceeded that far. Mezzanatto agreed to this, and the meeting began. The parties did not reach an agreement.

At trial, Mezzanatto offered testimony that was inconsistent with statements he made during the negotiations. The government introduced the prior statements to impeach Mezzanatto. The appellant objected, but the court overruled the objections and allowed the statements for impeachment.

The jury found Mezzanatto guilty, and the district court imposed a 170 month prison term to be followed by five years of supervised release.

## II.

### JURISDICTION AND STANDARDS OF REVIEW

The district court had jurisdiction under 18 U.S.C. § 3231, and we have jurisdiction under 28 U.S.C. § 1291. Whether plea negotiation statements may be introduced to impeach a defendant and whether a defendant may waive the prohibition against the introduction of plea negotiations statements are questions of law and of statutory interpretation, and therefore, we review these issues de novo. *See Anderson v. United States,* 966 F.2d 487, 489 (9th Cir.1992).

## III.

### DISCUSSION

A. *Issues on Appeal.*

This appeal involves Federal Rule of Evidence 410 and Federal Rule of Criminal Procedure 11(e)(6). Rule 11(e)(6) is nearly identical in form and is identical in substance to Rule 410. Rule 410 reads:

**Inadmissibility of Pleas, Plea Discussions, and Related Statements**

Except as otherwise provided in this rule, evidence of the following is not, in any civil or criminal proceeding, admissible against the defendant who made the plea or was a participant in the plea discussions:

(1) a plea of guilty which was later withdrawn;

(2) a plea of nolo contendere;

(3) any statement made in the course of any proceedings under Rule 11 of the Federal Rules of Criminal Procedure or comparable state procedure regarding either of the foregoing pleas; or

(4) any statement made in the course of plea discussions with an attorney for the prosecuting authority which do not result in a plea of guilty or which result in a plea of guilty later withdrawn.

However, such a statement is admissible (i) in any proceeding wherein another statement made in the course of the same plea or plea discussions has been introduced and the statement ought in fairness be considered contemporaneously with it, or (ii) in a criminal proceeding for perjury or false statement if the statement was made by the defendant under oath, on the record and in the presence of counsel.

Before reaching the primary issue this case presents, whether a defendant may waive the prohibition against the introduction

of statements made during plea negotiations, we examine the scope of the two rules.

## B. *The Scope of the Rules.*

Federal Rule of Evidence 410 and Federal Rule of Criminal Procedure 11(e)(6) are quite clear that statements made in the course of plea discussions are generally not admissible at trial. In only two instances are plea negotiation statements admissible. The first is an exception to prevent selective admission of plea negotiation statements. If a defendant introduces a statement made during plea negotiations, the prosecution may introduce other relevant plea negotiation statements so that the jury receives a full account of the issue presented. The only other exception allows for the admission of certain plea negotiation statements in a separate proceeding against the defendant for perjury. This exception is designed to permit punishment of defendants who take the stand and testify contrary to their plea negotiation statements. These two exceptions to an otherwise absolute rule do not include the use of such statements for impeachment.

The legislative history of these Rules is quite clear that plea negotiation statements are not admissible to impeach a defendant. A version of Rule 410, which never became effective, did allow plea negotiation statements to be introduced for impeachment, but this language was ultimately rejected. S.Rep. No. 1277, 93d Cong., 2d Sess. 10 (1974), *reprinted in* 1974 U.S.C.C.A.N. 7051, 7057; H.R.Conf.Rep. No. 414, 94th Cong., 1st Sess. 10 (1975), *reprinted in* 1975 U.S.C.C.A.N. 713, 714; *see also* Fed.R.Evid. 410 (1974); Pub.L. 94–149, 89 Stat. 805 (1975). Congress unmistakably did not want statements made during plea negotiations to be used to impeach defendants. Detailing this history concerning impeachment, the Second Circuit said, "We regard this legislative history as demonstrating Congress' ex-

plicit intention to preclude use of statements made in plea negotiations for impeachment purposes." *United States v. Lawson*, 683 F.2d 688, 692–93 (2d Cir.1982); *accord United States v. Martinez*, 536 F.2d 1107, 1108 (5th Cir.1976).

Commentators offer no disagreement. *See, e.g.,* Charles A. Wright & Kenneth W. Graham, Jr., 23 Federal Practice and Procedure § 5349 (1980); David W. Louisell & Christopher B. Mueller, 2 Federal Evidence § 188 (1985). No one argues that Congress did not mean what it said.

This brings us to the issue to which Congress did not speak. Can the defendant waive the protection of these rules?

## C. *The Protection Against the Admission of Statements Made During Plea Negotiations Cannot Be Waived.*

■ The issue of waiver of the protection of Rules 410 and 11(e)(6) is one of first impression.[1] The government contends that this rule may be waived by a defendant, and it argues that Mezzanatto knowingly and intelligently waived this protection. Mezzanatto insists that the prohibition in Rules 410 and 11(e)(6) may not be waived. We agree with the appellant.

The importance of the prohibition against the admission of plea negotiation statements is best understood in the broader context of the criminal justice system. Plea bargains are an important and useful part of our criminal justice system.[2] They allow criminal cases to be resolved in a quick and cost-effective manner while maintaining the just administration necessary to the criminal justice system. Rules 410 and 11(e)(6) were designed to promote plea agreements by encouraging frank discussion in negotiations because such unrestrained candor promotes effective plea bargaining. *See* Fed.R.Crim.P.

---

**1.** This issue was before the District of Columbia Circuit, but it resolved the case on other grounds. *United States v. Wood*, 879 F.2d 927, 937 (D.C.Cir.1989).

**2.** *See Blackledge v. Allison*, 431 U.S. 63, 71, 97 S.Ct. 1621, 1627, 52 L.Ed.2d 136 (1977) ("[T]he guilty plea and the often concomitant plea bargain are important components of this country's

criminal justice system. Properly administered, they can benefit all concerned."); *Santobello v. New York*, 404 U.S. 257, 261, 92 S.Ct. 495, 498, 30 L.Ed.2d 427 (1971) ("Disposition of charges after plea discussions is not only an essential part of the process but a highly desirable part for many reasons.").

11 adv. comm. note (1979), *reprinted in* 18 U.S.C.App. (1988).

For instance, prosecutors of those engaged in criminal conspiracies desire the fullest cooperation of those accused of participation therein. Frequently only by such cooperation can the organizers of the conspiracy, the higher-ups, be identified and prosecuted. Rules 11(e)(6) and 410 aid in obtaining this cooperation. A lesser member of the conspiracy will more freely provide useful information to the prosecutors if he knows that none of his statements in plea bargaining sessions can be used against him.

Moreover, full cooperation may enhance the prospects of a better plea bargain from the prosecutor. In a sense, most defendants who enter plea bargaining do so with the prospect of exchanging information about other offenses or defendants for a lesser punishment for themselves. The rules at issue here permit the plea bargainer to maximize what he has "to sell" with the ability to withdraw from the bargain proposed by the prosecutor without being harmed by any of his statements made in the course of an aborted plea bargaining session.

To allow waiver of these rules would be contrary to all that Congress intended to achieve. If these rules were subject to waiver, candid and effective plea bargaining could be severely injured. As the Eighth Circuit aptly explained, "[m]eaningful dialogue between the parties would, as a practical matter, be impossible if either party had to assume the risk that plea offers would be admissible in evidence." *United States v. Verdoorn,* 528 F.2d 103, 107 (8th Cir.1976). Waiver of the protections of Rules 410 and 11(e)(6) could easily have a chilling effect on the entire plea bargaining process. *See* Wayne R. LaFave & Jerold H. Israel, 2 Criminal Procedure § 20.2, at 611 (1984).

The government, not unreasonably, argues that since defendants can waive other statutory and constitutional rights, they should be able to waive Rules 410 and 11(e)(6).[3] They rely on *Newton v. Rumery,* 480 U.S. 386, 107 S.Ct. 1187, 94 L.Ed.2d 405 (1987), and *United States v. Navarro–Botello,* 912 F.2d 318 (9th Cir.1990), *cert. denied,* —— U.S. ——, 112 S.Ct. 1488, 117 L.Ed.2d 629 (1992), to support this argument. Neither these cases nor the analogy support the existence of a waiver power for these Rules.

In *Newton,* Mr. Rumery relinquished his personal right to pursue a civil remedy against the town of Newton, New Hampshire, which had arrested him, in exchange for a dismissal of all criminal charges against him. 480 U.S. at 390, 107 S.Ct. at 1190. The issue before the Court was whether such a "release-dismissal" agreement should be considered unenforceable as against public policy. *Id.* at 389, 107 S.Ct. at 1190. Although the Court agreed that such agreements may infringe on important interests of criminal defendants and society, *id.* at 392, 107 S.Ct. at 1191, the Court held that the agreement was enforceable because the "agreement would not adversely affect the relevant public interests." *Id.* at 398, 107 S.Ct. at 1195 (footnote omitted).

That conclusion is inapplicable to the situation here. To allow the government to enforce its waiver agreement would, as already pointed out, adversely affect the public interest in efficient criminal case resolution. Furthermore, *Newton* dealt with the waiver of a civil remedy and a dismissal of criminal charges. Unlike the present situation, the range of possible adverse consequences to society in *Newton* is quite small.

*Navarro–Botello* does not help the government, either. The government argues that

---

3. It is unclear whether the prohibition against the admission of plea negotiation statements in Rules 410 and 11(e)(6) should be considered an administrative rule or a personal right. But even if the prohibition is labeled a personal right, it is still not waivable. As the Supreme Court said nearly half a century ago, "a statutory right conferred on a private party, but affecting the public interest, may not be waived or released if such waiver or release contravenes the statutory policy.... Where a private right is granted in the public interest to effectuate a legislative policy, waiver of a right so charged or colored with the public interest will not be allowed where it would thwart the legislative policy which it was designed to effectuate." *Brooklyn Savings Bank v. O'Neil,* 324 U.S. 697, 704, 65 S.Ct. 895, 900, 89 L.Ed. 1296 (1945) (footnote and citations omitted). Allowing a waiver of these rules would contravene and thwart the policy—efficient case resolution through plea bargaining—these rules were designed to effectuate.

since defendants can waive the right to appeal, as in *Navarro–Botello*, 912 F.2d at 319–20, or certain other constitutional rights, a defendant should be able to waive the right to exclude plea negotiation statements. It is indisputable that defendants can waive certain rights during plea negotiations. But to allow waiver of Rules 410 and 11(e)(6), which are part of the plea bargaining mechanism, could damage the system approved by Congress and the Supreme Court. They do not guarantee substantive rights so much as they guarantee fair procedure.

To equate the waiver of these rules with that of an asserted constitutional protection is a false equality. Judicially created waivers of the latter are the result of an inescapable feature of courts interpreting the Constitution by defining the right being asserted. To write in a waiver in a waiverless rule promulgated by the Supreme Court and Congress, on the other hand, is not an inescapable duty. It more resembles unwelcome advice. Given the precision with which these rules are generally phrased, the comparative recentness of their promulgation, and the relative ease with which they are amended, the courts can afford to be hesitant in adding an important feature to an otherwise well-functioning rule.

Furthermore, the government should not be given the ability to extract a waiver of these rules from a defendant who is in a weak bargaining position. It should be noted that the government extracted the attempted waiver from Mezzanatto, not as part of a plea bargain, but simply as the price for the opportunity to enter into discussions that could have, but did not, lead to a plea bargain. With such a high entry cost, defense attorneys will be deterred from seeking plea bargains, and this will frustrate Congressional policy.

We therefore hold that the prohibition against the admissibility of statements made during plea negotiations is not subject to waiver.[4]

---

**4.** We are not holding that the introduction of plea negotiation statements is per se reversible error. If a defendant fails to object at trial to the introduction of such testimony, he has implicitly waived the protection. Furthermore, as is explained in the following part, any error is subject to a harmless error analysis.

## D. *The Error Was Not Harmless.*

Federal Rule of Criminal Procedure 11(h) requires a harmless error standard to be used for violations of plea bargaining rules. The same standard is applied for violations of Rule 410. *See Lawson*, 683 F.2d at 693. The contradictory impeachment evidence was clearly a significant blow to the appellant's defense. It easily could have altered the balance in the eyes of the jury. Therefore, we find the error was not harmless and set aside the conviction and reverse the judgment and remand to the district court.

We find no merit in the remainder of the appellant's contentions, but we direct the district court's attention to the Supreme Court's teachings in *United States v. Dunnigan*, —— U.S. ——, 113 S.Ct. 1111, 122 L.Ed.2d 445 (1993), should resentencing be required.

REVERSED and REMANDED.

WALLACE, Chief Judge, dissenting:

A criminal defendant may waive the most fundamental rights and protections afforded him or her by the Constitution or a statute. *Peretz v. United States*, —— U.S. ——, ——, 111 S.Ct. 2661, 2669, 115 L.Ed.2d 808 (1991); *United States v. Navarro–Botello*, 912 F.2d 318, 321 (9th Cir.1990) (*Navarro–Botello*), *cert. denied*, —— U.S. ——, 112 S.Ct. 1488, 117 L.Ed.2d 629 (1992). A defendant, for example, may knowingly and voluntarily waive the Fourth Amendment right to be free from warrantless searches, *see Schneckloth v. Bustamonte*, 412 U.S. 218, 248–49, 93 S.Ct. 2041, 2058, 36 L.Ed.2d 854 (1973); the Fifth Amendment privilege against self-incrimination, *see Navarro–Botello*, 912 F.2d at 321; the Sixth Amendment rights to counsel, *see Faretta v. California*, 422 U.S. 806, 834, 95 S.Ct. 2525, 2540, 45 L.Ed.2d 562 (1975); *Johnson v. Zerbst*, 304 U.S. 458, 464–65, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938), to a jury trial, and to confront and cross-examine witnesses, *see Navarro–Botello*, 912 F.2d at 321; and the statutory rights to appeal, *see id.*, and to pursue valid civil rights claims

against government officials, *see Town of Newton v. Rumery,* 480 U.S. 386, 392–98, 107 S.Ct. 1187, 1191–95, 94 L.Ed.2d 405 (1987) (*Newton* ).

A defendant, by failing to object at trial, also may implicitly waive his or her Fourth Amendment right against unlawful search and seizure, *see Segurola v. United States,* 275 U.S. 106, 110–11, 48 S.Ct. 77, 79, 72 L.Ed. 186 (1927); Fifth Amendment privilege against self-incrimination, *see United States v. Coleman,* 707 F.2d 374, 376 (9th Cir.), *cert. denied,* 464 U.S. 854, 104 S.Ct. 171, 78 L.Ed.2d 154 (1983), and against being placed in double jeopardy, *see United States v. Bascaro,* 742 F.2d 1335, 1365 (11th Cir.1984), *cert. denied,* 472 U.S. 1017, 105 S.Ct. 3476, 3477, 87 L.Ed.2d 613 (1985); and Sixth Amendment rights to be present at all stages of trial, *see United States v. Gagnon,* 470 U.S. 522, 528, 105 S.Ct. 1482, 1485, 84 L.Ed.2d 486 (1985), and to a public trial, *see Levine· v. United States,* 362 U.S. 610, 619, 80 S.Ct. 1038, 1044, 4 L.Ed.2d 989 (1960). As the Supreme Court summarized, "No procedural principle is more familiar to this Court than that a constitutional right may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it." *Yakus v. United States,* 321 U.S. 414, 444, 64 S.Ct. 660, 677, 88 L.Ed. 834 (1944).

Against this backdrop, the majority creates, without the assistance of precedent, a per se rule which invalidates any and all waivers of the protections afforded not by such basic and fundamental rights, but by Federal Rule of Evidence 410 and Federal Rule of Criminal Procedure 11(e)(6) (collectively· Rules). The majority brushes aside the question whether the waiver is knowing and voluntary; the newly crafted majority directive is absolute. The bases of this ruling are that to allow waiver would subvert the policies advanced by the Rules, that writing in a waiver would amount to "unwelcome advice," maj. op. at 1455–56, and that the availability of waivers would tempt governmental abuse. Because none of these bases supports the majority's position, and because there is no principled way to set these partic-

ular Rules apart from the vast majority of rules and rights that are subject to waiver, I dissent.

I

As for the first basis, that allowing waivers would subvert the policies advanced by the Rules, I have several objections. I start with what is not said: the majority has not identified what is so unique about the Rules that warrants a solicitude extended to very few rights or rules. At one point the majority states, without more, that the Rules should not be waived because they guarantee "fair procedure" rather than substantive rights. Maj. op. at 1455–56. Yet earlier in the opinion, the majority deems this distinction irrelevant, and goes·on to suggest that "personal right[s]" should be *less* subject to waiver than administrative procedural rules. *Id.* at 1455 n. 3. This· apparent contradiction is symptomatic of the majority's futile search for a sound distinction between the Rules and all those rules subject to waiver.

A distinction does not appear warranted based on policy, for surely the policies behind the Rules are no more important than the policies ·advanced by those rights and rules that may be waived. It would be difficult to conclude, for example, that the policy of quickly and cheaply resolving cases is more important than the policy of securing ourselves in our "persons, houses, papers, and effects." U.S. Const. amend. IV. Yet the criminal defendant who is subject to an unreasonable search and seizure may knowingly waive his Fourth Amendment rights as part of a plea bargain, or he may implicitly waive those rights by failing to object to the introduction of the resulting evidence. If a criminal defendant may waive such a fundamental constitutional right, I fail to see why the policies behind the Rules should preclude a criminal defendant, like Mezzanatto, from knowingly and voluntarily waiving the protection afforded by the Rules.

Nor does it appear that the effect of allowing waivers would be any greater in this context than it is in others. In fact, that effect may be diminished by the exception to the Rules. that allows statements made during plea bargaining to be used in later crimi-

nal proceedings for perjury. *See* Fed. R.Evid. 410(ii); Fed.R.Crim.P. 11(e)(6)(ii). Allowing a defendant to waive the bar against using his or her plea-related statements for impeachment purposes, therefore, merely enhances a deterrent which already exists within the Rules. Thus, if the policies represented by the Rules are no more important, and the subversive potential of waivers no greater in this context, there is little ground for distinguishing the Rules from the plethora of rules and rights subject to waivers.

The majority nonetheless contends that to allow waivers would be an injury not only to the defendants affected, but to the administration of the criminal justice system as a whole. Maj. op. at 1454–55. Although I recognize the possibility for harm to defendants and the criminal justice system that allowing waivers might create, I do not think this possibility justifies a per se rule against waivers. *See Newton,* 480 U.S. at 392, 107 S.Ct. at 1191 (holding mere possibility of harm to societal interests insufficient to create a per se rule against release-dismissal agreements). On the contrary, I believe that the majority, by implicitly vaulting plea agreements to the apex of goals sought to be achieved within the criminal justice system, has exaggerated greatly the potential harm represented by waivers.

I begin with the potential injuries to defendants. The defendant who waives his right to give inconsistent testimony at trial should the plea bargain prove fruitless seems to forfeit one "right" directly: the "right" to lie. By forfeiting his ability to provide inconsistent testimony at trial, the defendant has forsaken—or at least diminished—his "right" to lie at some stage of the prosecution. The defendant who forsakes this "right," of course, has sacrificed nothing, as no defendant has the "right" to provide false testimony. *Nix v. Whiteside,* 475 U.S. 157, 173, 106 S.Ct. 988, 997, 89 L.Ed.2d 123 (1986).

Another potential injury to future defendants—though not the defendant in *this* case—identified by the majority is that they may be compelled to forsake their "right" to plea bargain, if they find that the price of waiver is too high to pay. Such hypothetical

defendants also sacrifice a "right" which they never possessed. *See United States v. Wheat,* 813 F.2d 1399, 1405 (9th Cir.1987) (holding that "there is no right to a plea bargain"), *aff'd,* 486 U.S. 153, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988). In return for this sacrifice, these defendants must stand trial. Where is the harm to a defendant who is "coerced" into going to trial? The most consistent criticism waged against plea bargaining is that defendants are often coerced into pleading guilty to crimes they did not commit. *See generally Chaffin v. Stynchcombe,* 412 U.S. 17, 30–31, 93 S.Ct. 1977, 1984–85, 36 L.Ed.2d 714 (1973) (discussing coercive potential of several common plea-bargaining tactics). The majority has turned this criticism on its head, by suggesting that the problem with waivers is that they will coerce defendants to forgo plea bargaining.

As for the majority's contention that waivers will have a chilling effect on plea bargaining, I see three flaws. First, this prediction is completely speculative. The only evidence we have of the effects of allowing waiver is one case, this one, and the evidence here contradicts the majority's speculation. It does not necessarily follow that defendants will not enter into plea bargains if they first must waive the protection that their statements cannot be used to impeach them at trial.

Second, even assuming the majority's speculation is accurate, I would expect the system to correct itself. The majority recognizes that plea agreements are beneficial not only to criminal defendants. *See* maj. op. at 1455–56. Such agreements, as the majority asserts, are of great importance to the efficient administration of the criminal justice system; they are of value to the government. *Id.* Given the mutual benefits achieved through plea bargaining, should we expect the government continually to require waivers if such requirements significantly reduce the number of plea agreements reached?

Third, if the number of plea agreements actually does decrease, and more criminal defendants proceed to trial, it does not necessarily follow that the criminal justice system will fail. An unexplored presumption in the majority's opinion is that a reduction in the

number of plea bargains would somehow undermine our criminal justice system. I am not certain that the success or failure of criminal justice necessarily turns upon the present rate of plea bargaining. To be sure, more trials would add increased burdens to an already overcrowded court system, but I am not prepared to give such weight to the possible advent of more trials as does the majority.

## II

The majority's second rationale appears to be that we should not "write in a waiver" because it is not an "inescapable duty," and it would amount to "unwelcome advice." *Id.* at 1455–56. Our inescapable duty, as I see it, is to apply the law as it is presented to us, whether it be in the form of constitution, statute, or common law. If our application requires that we interpret the law, we can and must interpret it. The notion that we should not interpret a statute if it is "recently" promulgated (although the Rules here are approximately 20 years old), phrased with "precision" (although the Rules here are silent on the only contested issue), and relatively easily amended is a troubling, if not baffling, addition to the canons of statutory construction.

As for the majority's suggestion that we can "escape" interpretation of the Rules by not "writ[ing] in a waiver," *id.*, I strongly disagree. Indeed, the majority's decision shows quite clearly that interpreting the Rules is unavoidable in this case. For what does the majority do but "write in" a prohibition against waiver into Rules which, as the majority recognizes, are silent regarding the issue? *See id.* at 1454 (recognizing that waiver is an "issue to which Congress did not speak"). Deciding not to allow waivers is every bit as interpretive as deciding that waivers should be allowed. The majority has simply inferred the opposite conclusion than I from Congress's silence.

In addition, given the plethora of rules and rights which can be waived and the paucity of those which cannot, the majority's decision that the Rules here are among the select few unsuited for waiver is a significant act of judicial interpretation. As described at the outset of this dissent, the clear weight of judicial precedent is to allow knowing and voluntary waivers of rights and rules, even where those rules are completely silent regarding waivability. In reading Congress's silence as an indication that waivers should be prohibited, the majority has not only interpreted the Rules, but it has done so in a manner which runs counter to that precedent. Characterizing this interpretation as an act of judicial deference, in my view, is both inaccurate and insufficient to justify the majority's conclusion.

## III

The majority's third contention for a per se rule is that waivers allow for governmental abuse. Unfortunately for the majority, this rationale was rejected by the Supreme Court in *Newton.* 480 U.S. at 396–97, 107 S.Ct. at 1193–94. In refusing to fashion a per se rule against release-dismissal agreements, the Court observed that such a rule improperly "assumes that prosecutors will seize the opportunity for wrongdoing." *Id.* at 396, 107 S.Ct. at 1193. The majority here relies on this rejected assumption, despite the lack of any factual basis for doing so. Indeed, in this case it is clear that Mezzanatto knowingly and voluntarily waived the protections offered by the Rules. The answer is clearly stated by the Supreme Court: "tradition and experience justify our belief that the great majority of prosecutors will be faithful to their duty." *Id.* at 397, 107 S.Ct. at 1194. Given this tradition and experience, it strikes me as unwarranted to fashion a rule based on the assumption that the government will exploit unwitting defendants if given the opportunity.

## IV

Finally, a more generalized comparison between *Newton* and this case highlights the shortcomings in the majority's analysis. In *Newton,* the Supreme Court condoned release-dismissal agreements, whereby the government agrees to drop criminal charges against a defendant in exchange for the defendant's agreement not to pursue a civil rights claim against government officials.

The potential result of such an agreement is that the government drops legitimate criminal charges and the defendant drops legitimate civil rights claims. The Court recognized that these agreements may in some ·cases infringe important societal interests, but concluded that the "mere possibility of harm to these interests" does not justify a per se rule. *Id.* at 392, 107 S.Ct. at 1191.

The same conclusion is applicable to this case. The interests at stake here are certainly no more compelling. Notwithstanding the majority's somewhat startling assertion that "the range of possible adverse consequences to society in *Newton* is quite small," maj. op. at 1455–56, few would argue that ensuring the success of plea bargaining is more important than sanctioning government officials who commit civil rights violations. In addition, the potential for coercion seems much slighter here, and the potential consequences of any coercion less troubling. The defendant in *Newton* gave up a potentially legitimate civil rights suit; Mezzanatto, by contrast, gave up his ability to provide inconsistent testimony. Because the Supreme Court did not see fit to fashion a per se rule against release-dismissal agreements, I cannot accept the majority's new per se rule in this context.

### V

Mezzanatto requested the government to engage in plea discussions. Before those discussions began, he knowingly and voluntarily agreed that the testimony he provided during plea bargaining could be used to impeach him should he provide inconsistent testimony at trial. This is precisely what occurred. I see no reason not to honor Mezzanatto's agreement with the government. Because I would hold that the introduction of Mezzanatto's plea-bargaining statements was permissible, I would not need to reach the question of whether this alleged error was harmless. In addition, Mezzanatto's other challenges to his conviction and sentence are without merit. Thus, I would affirm.