UNITED STATES of America,
Plaintiff-Appellee,

v.

David R. LAWSON, Defendant-Appellant.

No. 704, Docket 81–1267.

United States Court of Appeals,
Second Circuit.

Argued Feb. 16, 1982.

Decided June 29, 1982.

Steven Lloyd Barrett, The Legal Aid Society Federal Defender Services Unit, New York City, for defendant-appellant.

Kathleen M. Mehltretter, Asst. U. S. Atty., Buffalo, N. Y. (Roger P. Williams, U. S. Atty., W. D. N. Y., Buffalo, N. Y., of counsel), for plaintiff-appellee.

David R. Lawson filed a brief pro se.

Before OAKES, TIMBERS and WINTER, Circuit Judges.

RALPH K. WINTER, Circuit Judge:

David R. Lawson appeals his conviction for bank robbery in the United States District Court for the Western District of New York, John T. Curtin, *Chief Judge*, after a jury trial. Appellant was sentenced on three counts to concurrent prison terms of 12 years, 10 years and 12 years, respectively. Lawson raises numerous issues on this appeal, including (1) the admission of statements he made in connection with an offer to plead guilty; (2) rulings limiting cross-examination as to the relationship between two prosecution witnesses; and (3) alleged errors in various other rulings.[1]

For the reasons set out below, we reverse.

## THE FACTS SUMMARIZED

On February 13, 1979, at approximately 3:00 p. m., four black men robbed the Pine Street branch of the Niagara County Savings Bank in Niagara Falls, New York. On May 22, 1980, Lawson and Allen Bell[2] were charged in a three-count indictment with violating 18 U.S.C. § 2113(a) (1976) (bank robbery), § 2113(b) (bank larceny), and § 2113(d) (bank robbery with a dangerous weapon). In December, 1980, Bell pleaded guilty to violating 18 U.S.C. § 2113(b) and agreed to testify against Lawson.

The government's main case rested primarily upon the testimony of Gloria Rotella, a bank teller; Allen Bell; and Sharon Harris, a friend of Bell's.

Rotella was working as a teller at the bank at the time of the robbery. After having been ordered to get down on the floor, she testified that she looked up and saw the face of one of the robbers for a "split second." Later, she identified a photograph of Lawson out of an array provided by the F. B. I. She was unable to make a positive identification at either the show-up or at trial. Rotella reiterated at trial that she had selected the photograph because it looked like the man she had seen, and the photograph was admitted in evidence.

---

1. The Legal Aid Society, Federal Defender Services Appeals Unit, has been appointed as counsel for appellant on this appeal, pursuant to the Criminal Justice Act. In addition to its own brief, The Legal Aid Society has filed a *pro se* brief by appellant.

2. The other two participants in the robbery apparently remain at large.

Bell testified that Lawson masterminded the robbery. He stated that Lawson recruited him and two others, gave instructions during the robbery and drove the getaway car. According to Bell, the stolen cash was divided up in the basement of Sharon Harris' house. On cross-examination, Bell stated that he had committed an earlier armed robbery with Lawson and that he, Bell, had been charged with the crime but Lawson had not. He admitted that he thought Lawson had made a deal in that case with state authorities to implicate Bell in exchange for his own freedom.[3]

Sharon Harris testified that Bell, Lawson and two others went to the basement in her house after the robbery. She described Lawson as saying "It was an easy shot." On cross-examination, the Judge precluded defense counsel from inquiring into Harris' conviction for prostitution and whether her relationship with Bell was one of pimp-prostitute, on the grounds that "prostitution is not related to truth telling...."

Throughout the case, Lawson maintained his innocence. He testified that he did not participate in the robbery and spent most of that day with an Ann Robinson. Lawson also stated that Bell had admitted that he falsely implicated him in the Niagara robbery solely because of Bell's belief that Lawson had alerted the police to Bell's role in the earlier robbery.[4] On cross-examination, the government sought to impeach Lawson through statements he had made to F. B. I. Agent Corcoran while in custody. Lawson had suggested a "deal" to Corcoran in which he would plead guilty and testify against his three accomplices in exchange for a four-year sentence to run concurrently with a state sentence he was about to begin.

Ann Robinson testified that, on the day of the robbery, Lawson picked her up about noon and they returned to his house, where they remained until about 3:00 p. m. They then went to a bar called Hamps' Lounge and were together until early evening. The prosecution's cross-examination of Robinson, which brought out some inconsistencies as to the date of these events, was based at least in part on notes made by F. B. I. Agent Lunde as to statements Robinson had made to him.

The prosecution called Agent Corcoran in rebuttal. He testified that Lawson had told him while in custody that "he would make a deal if the Government could guarantee him a maximum of four years and thereby he would plead guilty and testify."

The jury convicted Lawson on all three counts. The District Court imposed concurrent sentences on the counts of bank robbery, bank larceny and armed bank robbery, of 12 years, 10 years and 12 years, respectively. It ordered that Lawson begin serving the federal sentence only after completing a state sentence he was then serving. This order was apparently based upon the District Court's belief that "under law ... [the Court] must make the sentence consecutive to the sentence [Lawson is] already serving."

█ The parties agree that multiple convictions under various sections of 18 U.S.C. § 2113 may not be based on an identical set of facts, since acts violative of § 2113(a) or (b), or both, are merged into the conviction under § 2113(d). *Grimes v. United States*, 607 F.2d 6 (2d Cir. 1979); *United States v. Jenkins*, 665 F.2d 47 (2d Cir. 1981). We remand with directions to vacate the convictions and sentences for bank robbery under 18 U.S.C. § 2113(a), and for bank larceny under 18 U.S.C. § 2113(b).

The sentence of 12 years for violation of 18 U.S.C. § 2113(d) remains, however, and Lawson asks us to reverse on a variety of grounds.

## DISCUSSION

A. *Lawson's Statements to Agent Corcoran*

█ At the time Lawson made the statements described above to Agent Cor-

---

3. Bell pleaded guilty to the robbery and there never was a trial to confirm his suspicions that Lawson had agreed to testify against him.

4. Lawson presented the testimony of several men who had been incarcerated with Bell after the Niagara robbery that Bell had vowed to get even with Lawson.

coran, Fed.R.Evid. 410 and Fed.R.Crim.P. 11(e)(6) made inadmissible any statement made "in connection with" any offer to plead guilty or *nolo contendere* to a crime.[5] Both rules have been amended in the interim so as to apply only to statements made to prosecuting attorneys.[6] The government expressly waived at oral argument any claim that the new version is applicable either to Lawson's original trial or to a new trial.

Lawson claims that all testimony as to his statements to Agent Corcoran should have been excluded under Rules 410 and 11(e)(6). At a pre-trial hearing, the District Court expressed reservations about the admissibility of Lawson's statements. On November 18, 1980, the government wrote the District Court:

> Please be advised that after further consideration, the Government does not intend to attempt to introduce at trial any statements made by Mr. Lawson to F. B. I. Agent James Corcoran. This is in view of the fact that it is our opinion that the introduction of the statements would be precluded under Rule 410 of the Federal Rules of Evidence.

Nevertheless, the government used these statements to impeach Lawson's testimony. Two grounds are asserted in support of this use of the statements. First, it is argued that the statements were not made in the course of plea negotiations. The letter of November 18 clearly waives any such claim, however. If the statements were not made in plea negotiations, then Rules 410 and 11(e)(6) would be wholly inapplicable and the statements could have been used in the government's main case. The government was familiar with all the circumstances surrounding Lawson's conversations with Corcoran and the letter of November 18 plainly treats them as within Rule 410. That letter thus waives any position to the contrary. We need not, therefore, determine the impact of our decisions in *United States v. Levy*, 578 F.2d 896 (2d Cir. 1978), *United States v. Stirling*, 571 F.2d 708 (2d Cir. 1978), and *United States v. Arroyo-Angulo*, 580 F.2d 1137 (2d Cir. 1978), which in any event involve very different facts.

The second ground offered to support use of Lawson's statements relies on the language of Rules 410 and 11(e)(6) that such statements are not admissible "against the person who made the plea or offer. . . ." It

---

5. The relevant version of both Fed.R.Evid. 410 and Fed.R.Crim.P. 11(e)(6) read:

*Inadmissibility of Pleas, Offers of Pleas, and Related Statements.* Except as otherwise provided in this rule [paragraph], evidence of a plea of guilty, later withdrawn, or a plea of nolo contendere, or of an offer to plead guilty or nolo contendere to the crime charged or any other crime, or of statements made in connection with, and relevant to, any of the foregoing pleas or offers, is not admissible in any civil or criminal proceeding against the person who made the plea or offer. However, evidence of a statement made in connection with, and relevant to, a plea of guilty, later withdrawn, a plea of nolo contendere, or an offer to plead guilty or nolo contendere to the crime charged or any other crime, is admissible in a criminal proceeding for perjury or false statement if the statement was made by the defendant under oath, on the record, and in the presence of counsel.

6. Fed.R.Evid. 410 now reads:

*Inadmissibility of Pleas, Plea Discussions, and Related Statements.* Except as otherwise provided in this rule, evidence of the following is not, in any civil or criminal proceeding, admissible against the defendant who made the plea or was a participant in the plea discussions:

(1) a plea of guilty which was later withdrawn;

(2) a plea of nolo contendere;

(3) any statement made in the course of any proceedings under Rule 11 of the Federal Rules of Criminal Procedure or comparable state procedure regarding either of the foregoing pleas; or

(4) any statement made in the course of plea discussions with an attorney for the prosecuting authority which do not result in a plea of guilty or which result in a plea of guilty later withdrawn.

However, such a statement is admissible (i) in any proceeding wherein another statement made in the course of the same plea or plea discussions has been introduced and the statement ought in fairness be considered contemporaneously with it, or (ii) in a criminal proceeding for perjury or false statement if the statement was made by the defendant under oath, on the record and in the presence of counsel.

The current version of Fed.R.Crim.P. 11(e)(6) contains identical language.

is argued that "against the person" means use in the government's case-in-chief and not use for impeachment or rebuttal purposes. Whether the November 18, 1980 letter also waives this claim is a closer question. The letter does not qualify the denial of any intention to use the statements, and we hardly think that a pre-trial hearing was held solely to determine admissibility in the main case. Nevertheless, there is no indication that use for impeachment purposes was ever focused upon by the parties. Therefore, we reach the issue of admissibility.

In admitting the statements, the District Court relied upon *United States v. Havens*, 446 U.S. 620, 100 S.Ct. 1912, 64 L.Ed.2d 559 (1979). *Havens* held that pre-trial statements by a criminal defendant which would have been inadmissible as part of the prosecution's main case under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), might be used to impeach the defendant if he or she took the stand. We believe *Havens* is inapposite, however. A principal purpose of the exclusionary rule under *Miranda* is to deter police officers while Rules 410 and 11(e)(6) are designed to encourage plea bargaining. So far as deterrence in the former case is concerned, exclusion from the case-in-chief provides the needed deterrence. It is somewhat far-fetched to believe that police conduct of an interrogation of a suspect will involve fine calculations as to whether the particular suspect will take the stand in a trial months or years in the future. Plea bargaining involves a wholly different context. Not only does it usually occur closer to trial but it will in all but a few cases involve attorneys. Calculations as to use for impeachment purposes will clearly affect the discussions and impair the frank and open atmosphere Rules 410 and 11(e)(6) were designed to foster.

We are aided in resolving this question by an unusually clear legislative history. In considering these rules, Congress debated and rejected proposals that statements made in connection with an offer to plead guilty be available for impeachment purposes. Fed.R.Evid. 410, as originally promulgated by the Supreme Court, provided that "an offer to plead guilty ... or statements made in connection with [an offer to plead guilty], is not admissible in any civil or criminal proceeding against the person who made the ... offer." In 1974, the Senate proposed the addition of the following specific language to Rule 410:

> This rule should not apply to the introduction of voluntary and reliable statements made in court on the record in connection with [an offer to plead guilty] where offered for impeachment purposes or in a subsequent prosecution of the declarant for perjury or false statement.

*See* S.Rep.No.93–1277, 93d Cong., 2d Sess. 2 (October 18, 1974); *see also id.* at 10–11, *reprinted in* 1974 U.S.Code Cong. & Ad. News 7051, 7057–58. The Senate amendment was adopted by the Conference Committee but with a provision that Rule 410 would be superseded by any amendment to the Federal Rules of Criminal Procedure, which was inconsistent with it and was effective after the date of the Act establishing the Federal Rules of Evidence. *See* H.Conf.Rep.No.93–1597, 93d Cong., 2d Sess. 1 (December 14, 1974). The Conference Report explained that the issue was about to arise again in Congress' deliberations over Fed.R.Crim.P. 11(e)(6), which, as proposed by the Supreme Court, was "inconsistent" with the Conference Committee's Rule 410. H.Conf.Rep.No.93–1597 at 6–7, *reprinted in* 1974 U.S.Code Cong. & Ad.News 7098, 7100. On January 2, 1975, the latter rule was enacted with the proviso described above. Pub.L.No.93–595; 88 Stat. 1926, 1933 (1975).

Congress thereupon turned to the proposed Fed.R.Crim.P. 11(e)(6). Consistent with its prior position that offers to plead should be admissible for impeachment purposes, the Senate voted to eliminate Fed.R. Crim.P. 11(e)(6) so that the newly-enacted Rule 410 would prevail, thereby permitting use of plea bargaining statements for impeachment purposes. *See* 121 Cong.Rec. 23318–30 (July 17, 1975). The House, on the other hand, opposed the use of such statements for impeachment. *See* H.Rep. No.94–247, 94th Cong., 1st Sess. 7 (May 29,

1975), *reprinted in* 1975 U.S.Code Cong. & Ad.News 674, 679. The Conference Committee resolved the dispute in favor of the House view. The Conference Report states:

Rule 11(e)(6) deals with the use of statements made in connection with plea agreements. The House version permits a limited use of pleas of guilty, later withdrawn, or nolo contendere, offers of such pleas, and statements made in connection with such pleas or offers. Such evidence can be used in a perjury or false statement prosecution if the plea, offer, or related statement was made under oath, on the record, and in the presence of counsel. The Senate version permits evidence of voluntary and reliable statements made in court on the record to be used for the purpose of impeaching the credibility of the declarant or in a perjury or false statement prosecution.

The Conference adopts the House version. . . .

*See* H.Conf.Rep.No.94–414, 94th Cong., 1st Sess. 10 (July 28, 1975), *reprinted in* 1975 U.S.Code Cong. & Ad.News 713, 714. As finally adopted, Fed.R.Crim.P. 11(e)(6) was enacted on July 31, 1975, Pub.L.No.94-64, § 3(10), 89 Stat. 370, 372 (1975), and became effective on August 1, 1975. Fed.R.Evid. 410 as enacted on January 2, 1975, thus never became effective because Fed.R. Crim.P. 11(e)(6) was inconsistent with it. On December 12, 1975, a version of Rule 410 identical to Fed.R.Crim.P. 11(e)(6), was adopted by the Congress. Pub.L.No.94–149, § 1(9), 89 Stat. 805 (1975).

We regard this legislative history as demonstrating Congress' explicit intention to preclude use of statements made in plea negotiations for impeachment purposes. Indeed, even the Senate version would not have permitted use of the statements at issue here since they were not made in court and on the record. Their inadmissibility under Rules 410 and 11(e)(6) is thus beyond serious dispute.

The admission of Lawson's statements to Corcoran was not harmless error. The government's evidence was composed large-ly of uncertain eyewitness testimony and witnesses impeached for bias. Use of these statements to attack Lawson's credibility was thus no insignificant event and may well have altered the balance of the credible evidence in the eyes of the jury.

B. *Cross-Examination of Harris*

Sharon Harris testified that her basement had been used by Lawson and others after the robbery and that appellant had described the robbery as "an easy shot." Defense counsel sought to examine Harris concerning a 1978 conviction for prostitution and whether her relationship with Bell was one of pimp-prostitute. Harris had been living with Bell and continued to communicate with him after his imprisonment. The District Court sustained an objection to this line of inquiry on the grounds that it was not probative of Harris' truthfulness. The conviction, if offered solely to show previous dishonesty, might well be inadmissible under Rule 609(a)(2). *See United States v. Walker*, 613 F.2d 1349 (5th Cir. 1980); *United States v. Wright*, 564 F.2d 785 (8th Cir. 1977). It was offered for more than that, however. The cross-examination was designed to show not that Harris was a prostitute and, therefore, a liar, but that she was a prostitute and that Bell, as her pimp, might have caused her to lie about Lawson's involvement, because of his animus toward Lawson and because he had not been sentenced on his negotiated plea at the time of trial.

Foreclosing inquiry into a witness' bias is error unless the jury has other sufficient information of that possible bias. *United States v. Turcotte*, 515 F.2d 145, 151 (2d Cir.), *cert. denied, Gerry v. U.S.*, 423 U.S. 1032, 96 S.Ct. 564, 46 L.Ed.2d 406 (1975); *United States v. James*, 609 F.2d 36 (2d Cir. 1979). Although there was testimony that Harris and Bell had lived together before his imprisonment, we regard that as considerably different from a demonstration of a pimp-prostitute relationship. A jury might well believe that the latter relationship would entail substantially greater influence by Bell over Harris than a relationship as

lovers. In any event, it was entitled to know of such a relationship, if it existed. The failure to permit this cross-examination was thus error.

### C. *F. B. I. Agent Lunde's Report of His Interview with Robinson*

■ Ann Robinson testified that Lawson was with her at his home and, later, at a bar on the day the Niagara County Savings Bank robbery took place. The government used prior inconsistent statements made by Robinson to F. B. I. Agent Lunde to discredit her testimony. During the cross-examination of Robinson, government counsel used Lunde's written report of those statements to impeach her direct testimony by getting her to admit that she was not sure what days she met Lawson and, ultimately, to admit that "it was so long ago, I really can't remember if it was the same day or what."

Under Fed.R.Evid. 613(a), a prior statement of a witness used in cross-examining that witness must be disclosed to opposing counsel on request. Such a request was made on several occasions and refused for reasons which are none too clear. The government does not deny the applicability of Rule 613(a), that requests for disclosure were made or that they were improperly refused. We are told only that the impropriety was harmless error. At least in the absence of a claim of privilege or confidentiality, Rule 613(a) does not allow for the exercise of discretion. It flatly commands disclosure of a document such as this to opposing counsel. To the extent that Robinson is cross-examined upon a new trial as to prior inconsistent statements in Lunde's report, the report obviously must be given to defense counsel. Since the government can now achieve its purposes by using Robinson's inconsistent statements at trial induced by use of the report in the first instance, we believe the report must be disclosed if she is cross-examined at all on the relevant subject matter.

### D. *Pre-Indictment Delay*

■ Lawson also claims he was denied due process because he was indicted only after a 14-month investigation. During the period prior to indictment, two events occurred: Lawson's ex-wife agreed to testify against him and notes made by the bank teller who identified him were destroyed. Under *United States v. Lovasco*, 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977), pre-indictment delay constitutes a due process violation when it causes substantial prejudice to the defense and the delay was engineered by the government for an improper purpose, such as gaining a tactical advantage. *Id.* at 790, 795, 97 S.Ct. at 2048–2051. Otherwise, the statute of limitations provides the major protection against pre-indictment delay and actions brought within the limitations period will rarely be dismissed. *Id.* at 789, 97 S.Ct. at 2048; *see also United States v. Marion*, 404 U.S. 307, 322, 92 S.Ct. 455, 464, 30 L.Ed.2d 468 (1971).

■ Lawson has not met the *Lovasco* test. The testimony of his ex-wife was at best corroborative on minor points, and there is no showing that the teller's notes contained important evidence. Substantial prejudice was thus not demonstrated.

There is also nothing to indicate that the delay was a ploy by the government to gain a tactical advantage. At the time the indictment was returned, Lawson's wife had not agreed to testify against him and the government was thus not awaiting her cooperation to issue the indictment. As to the teller's notes, the government made repeated, fruitless efforts to locate them. In addition, there is nothing to indicate that the government ever saw the notes or knew when they were destroyed. Thus, neither prong of the *Lovasco* test is satisfied.

### E. *Sentencing*

■ Lawson challenges the fact that his sentence for the Niagara County Bank robbery is consecutive to the state sentence he is currently serving. The District Court expressed the view that "under law" the federal sentence must be made consecutive to an existing state sentence. Consecutive sentences in such circumstances are permis-

sible but not mandatory. District Courts have an option to recommend to the Attorney General that federal sentences be served concurrently with state sentences. Although such a recommendation is not binding, it is entitled to substantial weight. Under 18 U.S.C. § 4082(a) and (b) (1976), the Attorney General can designate a federal prisoner's place of confinement, including a state institution, for service of a federal sentence. The Attorney General can thus make a federal sentence concurrent with a state sentence being served at a state facility. *See, e.g., United States v. Huss*, 520 F.2d 598, 602 (2d Cir. 1975); *Floyd v. Henderson*, 456 F.2d 1117, 1119 (5th Cir. 1972). Since appellant is entitled to a new trial, we offer these observations as guidance.

### F. *Other Issues*

Lawson's counsel raises a second issue as to the sentencing which is now moot in light of our reversal. Lawson's *pro se* brief raises a host of other issues which we have examined and find either moot or without merit.

Reversed and remanded.

TIMBERS, Circuit Judge, concurring in part and dissenting in part:

### I.

I concur with the majority to the extent that it holds as follows:

(1) That the convictions and sentences for simple bank robbery and bank larceny, in violation respectively of 18 U.S.C. §§ 2113(a) and 2113(b) (1976), must be vacated in accordance with our prior decisions. *United States v. Evans*, 665 F.2d 54 (2 Cir. 1981); *United States v. Jenkins*, 665 F.2d 47 (2 Cir. 1981); *Grimes v. United States*, 607 F.2d 6 (2 Cir. 1979). Those convictions and sentences were merged in the conviction and 12 year sentence imposed on appellant for armed bank robbery, in violation of 18 U.S.C. § 2113(d) (1976) (which I believe should be affirmed).

(2) That it was discretionary with the district court, not mandatory, to order that appellant's federal bank robbery sentence be served consecutively to the state sentence appellant is serving.

(3) That there is no merit to appellant's claim of denial of due process because of pre-indictment delay.

(4) That the issues raised in appellant's *pro se* brief are either moot or without merit.

With respect to the remainder of the majority opinion, I disagree—chiefly its holdings (1) that the government was precluded from using plea negotiation evidence for impeachment purposes, and (2) that the district court erred in limiting cross-examination by defense counsel with respect to the pimp-prostitute relationship between two government witnesses. As for the majority's holdings on these issues, I respectfully dissent for the reasons set forth below.

### II.

The majority holds that the government was precluded from using the plea negotiation evidence for impeachment purposes. It says that the government waived its right to introduce the evidence by its pretrial letter stating that such evidence would not be introduced at trial. The majority further holds that in any event the use of such evidence for impeachment purposes is barred by Fed.R.Crim.P. 11(e)(6) and Fed.R. Evid. 410.

I disagree, under the circumstances of this case where there was no prejudice to appellant, that the letter should be regarded as having waived any right the government may have had to use the evidence. The government did not introduce the evidence in its case in chief; rather, it used the evidence only for impeachment. It strikes me as an overly restrictive view of prosecutorial discretion to hold that the government was forever precluded from using the evidence, despite the possibility of a change of circumstances after making the declaration.

To me, the only arguable reason for the majority's holding—curiously, not relied on by the majority—is the possible prejudice to a defendant in stating that the evidence will not be used and then using it. Here, however, there was no prejudice or surprise whatsoever. The government notified appellant before the defense began its case that it would use the evidence. This is a significantly different situation from one in which the government might use the evidence with no advance warning at all. The most that appellant can complain of here is that the evidence was damaging. He cannot claim any bona fide prejudice or surprise.

I do not dispute the proposition that, if the evidence was inadmissible under the Federal Rules in the government's case in chief, it likewise would be inadmissible for impeachment purposes. The wording of the Rules and the legislative history make this clear. First, the Rules provide that the evidence cannot be used "against the defendant"; the use of the evidence for impeachment clearly *is* against the defendant. Second, the failure of Congress to include an exception allowing for use of the evidence for impeachment, despite the Senate's interest in having such a provision, suggests that the use of such evidence for impeachment is foreclosed.

Nevertheless, in my view the Rules do not apply here. Undoubtedly the evidence would be admissible under the current versions of Fed.R.Evid. 410 and Fed.R.Crim.P. 11(e)(6). I would reach the same result here under the previous versions of the Rules in view of the circumstances of this case.

First, appellant contacted an FBI agent—not a prosecutor or an attorney—to try to arrange a deal. Although the Rules in effect at that time did not limit the contacts explicitly to those between a defendant and government attorneys, both the Advisory Committee on Criminal Rules and certain cases concluded that Congress had intended the earlier Rules to be so limited. *See* 77 F.R.D. 507, 534–35 (1978) (Advisory Committee Note to Fed.R.Crim.P. 11(e)(6)); *e.g.,*

*United States v. Grant,* 622 F.2d 308, 313 & n.3 (8 Cir. 1980).

Second, if we are to be faithful to prior decisions of our Court, there simply were no "plea discussions" within the meaning of the Rules. In *United States v. Arroyo-Angulo,* 580 F.2d 1137, 1148 (2 Cir.), *cert. denied,* 439 U.S. 913 (1978), we held that there was no violation of Fed.R.Crim.P. 11(e)(6) when the government used evidence of plea discussions. We stated that factors in deciding whether the Rule forbids such use were that no criminal charges had been filed when the contact was made and that the purpose of the contact by defendant was to stave off his prosecution. In the instant case, no charges had been filed and appellant later admitted that he was negotiating to gain time on the streets. In addition, the agent was not a prosecutor, as appellant knew. Finally, in *Arroyo-Angulo* the evidence was introduced in the government's case in chief, not merely for impeachment as here. Thus there is even stronger reason for holding that the use of the evidence in the instant case was proper.

Furthermore, in *United States v. Levy,* 578 F.2d 896, 901 (2 Cir. 1978), we held that, notwithstanding Rules 410 and 11(e)(6), the admissions could be received in evidence where the offers of cooperation were made to agents who did not initiate the conversation. Here, by appellant's own admission, he initiated the contact at which what the majority characterizes as "plea discussions" were held.

### III.

With respect to the majority's holding that the district judge should have allowed the defense to show that a government witness had been convicted of prostitution and had worked for Allen Bell, the principal witness against appellant, I disagree that there was reversible error.

The test in this Circuit as to whether a district judge committed reversible error in excluding such evidence of bias is "whether the jury is in possession of sufficient information to make a discriminating appraisal

of the witness' possible motives for testifying falsely in favor of the government." *United States v. James,* 609 F.2d 36, 47 (2 Cir. 1979), *cert. denied,* 445 U.S. 905 (1980). In *James,* the jury knew that the witness had cooperated with the government in another case and that he had not been indicted despite his involvement. We held that it was not reversible error for the judge to refuse to admit evidence of deals with the government. *Accord, United States v. Singh,* 628 F.2d 758, 763 (2 Cir.) ("A trial court is allowed wide discretion in the management of the cross-examination of witnesses."), *cert. denied,* 449 U.S. 1034 (1980).

Here, the jury knew that Harris and Bell were friends, possibly lovers. They could infer that, if she was associated with an admitted bank robber, she was not of outstanding character and might be inclined to lie. Since Bell and Harris lived together from time to time, the jury could infer that, because Bell had a motive to testify against appellant, so did Harris. Moreover, Harris was not the only witness who testified that appellant was involved in the robbery.

I would affirm appellant's conviction and 12 year sentence for armed bank robbery. From the majority's refusal to do so, I respectfully dissent.