**SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**

v.

**Daryl M. PAYTON, and Benjamin Durant, III, Defendants.**

**14 Civ. 4644**

United States District Court, S.D. New York.

Signed April 4, 2016

Filed April 5, 2016

A. Kristina Littman, Catherine Eleni Pappas, G. Jeffrey Boujoukos, Sharon Blaskey Binger, David Lawrence Axelrod, Scott A. Thompson, U.S. Securities and Exchange Commission, Philadelphia, PA, for Plaintiff.

Ada Fernandez Johnson, Jonathan Rosser Tuttle, Laura Emily O'Neill, Debevoise & Plimpton LLP, Washington, DC, Sean Hecker, Kaitlin Teresa Farrell, Matthew E. Fishbein, Rushmi Bhaskaran, Debevoise & Plimpton, LLP, Noam B. Greenspan, Petrillo Klein & Boxer LLP, Gregory Robert Morvillo, E. Scott Morvillo, Nicole Renee Lloret, Robert Craig Morvillo, Morvillo LLP, Eugene Edward Ingoglia, United States Attorney's Office, Peter Simpson Ross, New York, NY, for Defendants.

## OPINION AND ORDER

JED S. RAKOFF, UNITED STATES DISTRICT JUDGE.

In February 2016, Daryl M. Payton and Benjamin Durant, III stood trial on insider trading charges brought by the Securities and Exchange Commission ("SEC"). The SEC alleged that in 2009, defendants Payton and Durant traded on material, non-public information about IBM's pending acquisition of SPSS, Inc. ("SPSS"). See

Amended Complaint, Dkt. 32, ¶ 1. On February 29, 2016, the jury held both defendants liable. See Verdict, Dkt. 136. During the trial, the issue arose of whether M r. Payton gave trial testimony that materially conflicted with the allocution he provided while entering a guilty plea (now vacated) in a parallel criminal case. Accordingly, the Court conducted an inquiry into the matter (see infra) and invited both defendant Payton and the SEC to submit letters after trial on whether the Court should refer Mr. Payton to the U.S. Attorney's Office for a possible perjury prosecution. See Letter dated March 3, 2016 ("Payton Post-Trial Letter"); Letter dated March 7, 2016 ("SEC Post-Trial Letter"). (These letters will be docketed along with this Opinion.)

Having considered the parties' submissions, Mr. Payton's testimony and demeanor at trial, and the prior history of the case, the Court, while deeply troubled by the material inconsistencies in Mr. Payton's statements given under oath, hereby decides not to formally refer Mr. Payton to the U.S. Attorney's Office for a possible perjury prosecution. This does not negate the possibility, however, that the U.S. Attorney's Office may on its own wish to investigate possible perjury by Mr. Payton; and plaintiff SEC, like any party, is free to bring this issue to the attention of the U.S. Attorney. However, a court should hesitate before making such a formal referral, given the weight that such a referral may have.

 Nonetheless, in this case, the decision not to make a referral was not easily reached, and the Court finds it instructive to review the facts and principles that have informed its decision. The federal perjury statute here relevant, 18 U.S.C. § 1623, states that "[w]hoever under oath ... in any proceeding before or ancillary to any court or grand jury of the United States knowingly makes any false material declaration ... shall be fined under this title or imprisoned not more than five years, or both." 18 U.S.C. § 162 3(a). This statute, technically called the "False Declarations" statute, was designed to supplement the earlier perjury statute, 18 U.S.C. § 1621, by eliminating some of the historic hyper-technicalities with which the earlier statute was fettered. In both cases, however, the federal perjury statutes aim to "keep the course of justice free from the pollution of perjury," United States v. Williams, 341 U.S. 58, 68, 71 S.Ct. 595, 95 L.Ed. 747 (1951), since "[p]erjury is an obstruction of justice; its perpetration well may affect the dearest concerns of the parties before a tribunal." United States v. Norris, 300 U.S. 564, 574, 57 S.Ct. 535, 81 L.Ed. 808 (1937). As the Second Circuit has explained, "[n]o legal system can long remain viable if lying under oath is treated as no more than a social solecism. Swearing to tell the truth is a solemn oath, the breach of which should have serious consequences." United States v. Cornielle, 171 F.3d 748, 753 (2d Cir.1999).

Despite the seriousness of perjury, "it is undoubtedly the case that a good many untruthful statements occur during the course of a civil trial." Cornielle, 171 F.3d at 751.[1] Though criminal prosecutions have been brought for perjury in civil cases, see,

---

1. In the 1970s, Judge Marvin E. Frankel of the Southern District of New York estimated that "deliberately false testimony probably appears in important aspects in as many as a quarter of all the cases we try." See Lying in the Courtroom, Harper's Magazine, September 1973, at 10. Judge Frankel continued: "I think perhaps the courts are too complacent about this and the crime of perjury needs more vigorous prosecution." Id; see also Marvin E. Frankel, The Search for Truth: An Umpireal View, 123 U. Pa. L. Rev. 1031, 1032 (1975) ("our adversary system rates truth too low among the values that institutions of justice are meant to serve."). In 1995, an American Bar Association Journal article observed that "[m]ost of the more than 50 state and federal judges, as well as lawyers and aca-

e.g., United States v. Thompson, 29 F.3d 62 (2d Cir.1994), United States v. Kross, 14 F.3d 751 (2d Cir.1994), still, "the instances in which perjury in civil cases is prosecuted criminally are relatively rare." Miller v. Time–Warner Commc'ns, Inc., 97–cv–7286, 1999 WL 739528, at *3 (S.D.N.Y. Sept. 22, 1999). One explanation is that "many such falsehoods essentially are resolved by adverse jury verdicts, leaving for criminal prosecution those few instances where a witness' lie is so material to the truth-seeking function of a trial that the prosecutor (sometimes, upon the referral of the trial judge) elects to seek an indictment." Cornielle, 171 F.3d at 751. And yet the very fact that prosecution for perjury committed in a civil case is rare doubtless encourages civil litigants to believe they can lie with impunity. See Marvin E. Frankel, The Adversary Judge, 54 Tex. L. Rev. 465, 483 (1976).

Against this background, the Court turns to the factual and procedural history of the instant case. On June 25, 2014, the SEC filed suit against defendants Payton and Durant, contending that the defendants had violated the laws against insider trading by trading in SPSS securities ahead of IBM's acquisition of SPSS. See Complaint, Dkt. 2, ¶ 1. On October 29, 2014, Messrs. Payton and Durant were indicted in a parallel criminal case in front of Judge Andrew Carter on one count of conspiracy to commit securities fraud and multiple substantive counts of securities fraud (three in Mr. Payton's case, and two in Mr. Durant's case). See United States v. Conradt et al., 12-cr-887 (ALC), Dkt. 95[2] (Superseding Indictment). On November 6, 2014, Mr. Payton pled guilty in front of Judge Carter to conspiracy to commit securities fraud. See Transcript of Proceedings dated Nov. 6, 2014, 12-cr-887, Dkt. 105 ("Payton Plea Tr."). After being placed under oath, see Payton Plea Tr. 12:20-22, Mr. Payton allocated as follows:

> In July of 2009 I was working as a stockbroker for a brokerage firm in Manhattan. One of the brokers at the brokerage firm told me his roommate told him that IBM would soon be acquiring a software company called SPSS at a specific price per share and that we should invest in this stock. I understood that once this acquisition was announced, the price of SPSS shares would rise dramatically. I purchased, from Manhattan, on a national securities exchange, options of SPSS based on this information. After the deal was announced I sold my options for a profit. Given the specificity of the information, it was apparent that this information was obtained in breach of fiduciary duty. In other words, I understood that this was inside information that was supposed to be kept confidential and that it was illegal for me to trade on.
>
> I apologize and I am very sorry for my actions.
>
> THE COURT: And this activity, was this done pursuant it [sic] an agreement that you had with some other people? (Defendant and counsel conferring)
>
> THE DEFENDANT: An understanding? Yes. Yes, your Honor.

Payton Plea Tr. 28:13-29:8.

After further discussion with counsel, the Court asked M r. Payton some follow-up questions:

---

demics, interviewed by the ABA Journal agree that perjury in some form permeates civil and criminal courts." The article quoted a statement from E. Michael McCann, a county prosecutor in Milwaukee who chaired the ABA Section of Criminal Justice: "If perjury were water, the people in civil court would be drowning." Mark Curriden, The Lies Have It, 81 ABA Journal 68, 69, 70 (1995).

**2.** This docket number refers to the 12-cr-887 docket, as do all other docket numbers following a reference to the parallel criminal case's docket.

THE COURT: ... You indicated that you felt the information had been provided in breach of a fiduciary duty because of the specificity of the information; is that correct?

THE DEFENDANT: Yes, your Honor.

THE COURT: Tell me a little bit more about that.

THE DEFENDANT: Just that he specified that the company, IBM, would be the likely acquirer of SPSS-sorry, that he spoke to IBM about specifically purchasing SPSS at a particular share price.

THE COURT: When you say "he," who [m] are you talking about?

THE DEFENDANT: Tom Conradt.

Payton Plea Tr. 35:16-36:3.

After receiving subsequent letters from the parties on the sufficiency of Mr. Payton's guilty plea, Judge Carter accepted his plea at a conference held on November 18, 2014. See Transcript of Proceedings dated Nov. 18, 2014, 12-cr-887, Dkt. 146, 5:6-9. However, on December 10, 2014, the Second Circuit issued its decision in United States v. Newman, 773 F.3d 438 (2d Cir.2014), raising issues about personal benefit to the tipper and about the tippee's knowledge of such benefit that were not part of Mr. Payton's allocution. At a status conference on December 18, 2014, Judge Carter stated that in light of Newman, he was inclined to vacate Mr. Payton's plea on the ground that there was an insufficient factual basis for the plea. See Transcript of Proceedings dated Dec. 18, 2014, 12-cr-887, Dkt. 143, 49:16-20. Judge Carter had the same view of the guilty pleas of Mr. Payton's co-defendants Trent Martin, Thomas Conradt, and David Weishaus. See id. at 24:22-25:1; 29:15-17: 41:24-42:3. Mr. Durant, however, had pled not guilty, so he was not implicated by Judge Carter's remarks.

On January 12, 2015, the Government submitted a brief to Judge Carter arguing that the defendants' guilty pleas were sufficient. See The Government's Memorandum of Law in Support of the Sufficiency of the Defendants' Guilty Pleas, 12-cr-887, Dkt. 153. On January 16, 2015, Mr. Payton moved to vacate his guilty plea, arguing that he had never admitted that he knew that the tipper had received a personal benefit, as Newman required. See Memorandum in Support of Daryl Payton's Motion to Vacate His Guilty Plea, 12-cr-887, Dkt. 154, at 2-3. On January 22, 2015, Judge Carter vacated Mr. Payton's guilty plea (as well as the pleas of Messrs. Conradt, Martin, and Weishaus). See Order dated Jan. 22, 2015, 12-cr-887, Dkt. 166. Soon after, on January 30, 2015, the Government filed a nolle prosequi with respect to Messrs. Payton, Durant, Conradt, Martin, and Weishaus. See Nolle Prosequi, 12-cr-887, Dkt. 170.

Meanwhile, however, the parallel civil case in this Court continued forward, with the SEC arguing it could meet the Newman requirements. After this Court denied defendants' motion to dismiss and motion for summary judgment, see Opinion and Order dated Apr. 6, 2015, Dkt. 42; Order dated Sept. 11, 2015, Dkt. 71, the case proceeded to trial beginning on February 16, 2016. While on the witness stand on February 24, 2016, Mr. Payton made statements that seemingly were materially inconsistent with the statements he had made under oath at his plea allocution in the parallel criminal case (see infra). The Court, aware of Mr. Payton's prior statements before Judge Carter, felt particularly obligated to inquire further (outside the presence of the jury), for the following reasons:

Before trial, the SEC had moved in limine (1) to admit statements that defendant Payton made in his guilty plea allocution ("plea allocution statements") and to question him on these statements; (2) in

the alternative, to use these statements for the purposes of impeachment; and (3) to estop Mr. Payton from offering testimony or argument that contradicted his plea allocution statements. See Securities and Exchange Commission's Memorandum of Law in Support of Its Motion In Limine to Question Defendant Payton Regarding Statements in His Guilty Plea Colloquy and to Estop Payton From Offering Contradictory Testimony or Argument ("SEC Mot. in Limine Br."), Dkt. 100, at 1. The Court had denied the SEC's motion and, in particular, rejected the SEC's effort to use Mr. Payton's plea allocution statements for impeachment purposes. See Order dated Feb. 4, 2016, Dkt. 118; Transcript dated Feb. 29, 2016 ("Feb. 29 Tr."), 9:7-13.[3] In support of this ruling, the Court cited Rule 410 of the Federal Rules of Evidence. See Order dated Feb. 4, 2016; Feb. 29 Tr. 9:14-15.

Fed. R. Evid. 410(a) provides that "[i]n a civil or criminal case, evidence of the following is not admissible against the defendant who made the plea or participated in the plea discussions: (1) a guilty plea that was later withdrawn; (2) a nolo contendere plea; (3) a statement made during a proceeding on either of those pleas under Federal Rule of Criminal Procedure 11 [which covers pleas] ..." On its face, Rule 410 allows for only two, limited exceptions:

> The court may admit a statement described in Rule 410(a)(3) ... (1) in any proceeding in which another statement made during the same plea or plea discussions has been introduced, if in fairness the statements ought to be considered together; or (2) in a criminal proceeding for perjury or false statement, if the defendant made the state-

ment under oath, on the record, and with counsel present.

Fed. R. Evid. 410 (b).

The Court denied the SEC's motion in limine, for several reasons. First, the SEC's proposed uses did not fall within the exceptions permitted by Rule 410. Although the SEC argued that Rule 410 was inapplicable because Mr. Payton did not "withdraw" his guilty plea, see SEC Mot. in Limine Br. at 6-8, Mr. Payton's guilty plea was vacated after he moved for such relief, and any possible distinction between Mr. Payton's situation and that of one who "withdraws" his plea did not materially affect Rule 410's application for current purposes.

Second, the legislative history of Rule 410 bolstered the conclusion that Rule 410 mandates the exclusion of Mr. Payton's plea allocution statements. As the Second Circuit explained in United States v. Lawson, 683 F.2d 688 (2d Cir.1982), the Senate in 1974 proposed an addition to Fed. R. Evid. 410 by which that Rule "should not apply to the introduction of voluntary and reliable statements made in court on the record in connection with (an offer to plead guilty) where offered for impeachment purposes or in a subsequent prosecution of the declarant for perjury or false statement." Lawson, 683 F.2d at 692. The Report of the Senate Committee on the Judiciary accompanying the Senate's version of the proposed amendment explained that the House of Representatives' alternative version of Rule 410 would "render inadmissible for any purpose statements made in connection with" pleas of guilty or nolo contendere that are subsequently withdrawn. S. Rep. No. 93-1277, at 7057 (1974). The Senate Committee Report then high-

---

**3.** "Transcript dated Feb. 29, 2016" refers to the transcript of the hearing, conducted out of the presence of the jury, during which the Court made inquiries of the counsel repre-

senting Mr. Payton at the time of his guilty plea (see infra). "Trial Transcript" refers to the transcript of the SEC v. Payton and Durant trial.

lighted the difficulties with the House of Representatives' approach:

> Of course, in certain circumstances such statements should be excluded. If, for example, a plea is vitiated because of coercion, statements made in connection with the plea may also have been coerced and should be inadmissible on that basis. In other cases, however, voluntary statements of an accused made in court on the record, in connection with a plea, and determined by a court to be reliable should be admissible even though the plea is subsequently withdrawn. This is particularly true in those cases where, if the House rule were in effect, a defendant would be able to contradict his previous statements and thereby lie with impunity.

Id. "To prevent such an injustice," the Senate Committee Report continued, Rule 410 was "modified to permit the use of such statements for the limited purposes of impeachment and in subsequent perjury or false statement prosecutions." Id.

So far as impeachment was concerned, however, the Senate's point of view did not prevail. See Lawson, 683 F.2d at 692–93. Instead, first by an amendment to Fed. R. Crim. P. 11(e) (6), and then ultimately by enacting the current wording of Fed. R. Evid. 410, Congress opted to permit the use of statements made in connection with withdrawn guilty pleas in perjury prosecutions, but not for impeachment. See Pub. L. No. 94-64, 89 Stat. 370 (1975); Pub. L. No. 94-149, 89 Stat. 805 (1975).[4] In doing so, Congress adopted the House of Representatives' approach. See H.R. Conf. Rep. 94-414, at 10; Lawson, 683 F.2d at 693.

While legislative history must always be approached with caution, it is hard to imagine legislative history that more clearly evidences Congress's intent to prohibit the use for impeachment purposes of statements made in connection with a withdrawn guilty plea. See Lawson, 683 F.2d at 693; United States v. Udeagu, 110 F.R.D. 172, 175 (E.D.N.Y.1986). For these reasons, the Court denied the SEC's motion to use Mr. Payton's guilty plea statements for impeachment purposes.

This limitation, however, only served to highlight the need for the Court to examine with care any testimony by Mr. Payton that was inconsistent with his plea allocution, since a referral by the Court of any perceived perjury would be one of the few safeguards remaining to wanton disregard for prior statements made under oath. Indeed, Mr. Payton's counsel effectively invited such scrutiny when, in opposing the SEC's motion in limine to introduce Mr. Payton's plea allocution statements for impeachment purposes, he stated:

> [Fed. R. Evid.] 410 balances competing concerns about trying to encourage plea discussions and pleas on the one hand and a recognition that in subsequent proceedings you want to ensure that people tell the truth. 410 allows you to prosecute someone for perjury if in a subsequent proceeding you take a materially inconsistent position and the government wants to refer it for criminal prosecution and my client is fully informed about that risk .... there's a sword hanging over our client's head if he testifies in a 180-degree different way from what he said in his plea allocution.

Transcript of Oral Argument dated Feb. 1, 2016, 47:14-21, 50:15-18.

Yet, before long, such seeming inconsistencies appeared to emerge. Specifically, Mr. Payton's trial testimony, as here relevant, proceeded as follows. Mr. Payton was asked by the SEC's counsel: "Before you

---

4. Today, the Federal Rules of Criminal Procedure provide that "[t]he admissibility or inadmissibility of a plea, a plea discussion, and any related statement is governed by Federal Rule of Evidence 410." Fed. R. Crim. P. 11(f).

traded, you learned that SPSS was going to be acquired; correct?" Tr. 459:4-5. Mr. Payton responded:

Yes. Before I traded—I'm not sure, you know, if I even at that point recognized, you know, SPSS per se, but the whole idea was a buyout .... The idea that was brought to me by Tom was about a company that was, you know, potentially going to be bought out. So, you know, after that when I actually followed up and talked to Ben [Durant] about the idea, I then learned that it was SPSS, that is what was brought to me, yes.

Tr. 459:6-8, 13-17. When asked again whether he knew that SPSS was the target of a buyout or acquisition before he traded, M r. Payton responded: "That is the rumor; that is what was shared to me by Tom Conradt." Tr. 459:22-23. The SEC's counsel then asked Mr. Payton whether he thought the SPSS information about the buyout was material before he traded on July 22, 2009, and Mr. Payton responded "Did I think it was material? I did not know for certain, you know, what it was. I knew that, you know—" Tr. 459:24-460:2.

The Court then called a sidebar to inquire into whether materiality was at issue in the case, given earlier indications that it was not. See Tr. 461-465. After questioning resumed, the SEC's counsel asked Mr. Payton: "Before you traded on July 22nd, Tom Conradt had told you that his roommate had told him that IBM would soon be acquiring SPSS, correct?" Tr. 467:23-25. Mr. Payton answered "I don't—I don't

remember that precise detail that he shared." Tr. 468:1-2. The following exchange then took place:

Q [SEC's counsel]: ... Before you traded, Tom Conradt had actually said "my roommate told me that IBM would soon be acquiring SPSS"; isn't that right?
A: I don't recall Tom specifically saying that, you know, that his roommate told him. You know, I just remember the gist of my conversation with Tom was that there was a buyout, and that, ultimately, I did understand SPSS was the target.
Q: Let me ask it this way: When you say you don't recall that happening, are you saying that didn't happen or you don't remember if that happened?
A: I'm saying Tom said a lot of things, and it's certainly possible. You know, some of those things are possible but I'm saying I don't remember, for me right here sitting here, to say, you know, before I made that trade, this is specifically what Tom told me. I just can't say that.

Tr. 468:15-469:4. Shortly thereafter the SEC's counsel attempted to refresh Mr. Payton's recollection by showing him his guilty plea allocution, but the attempt was unsuccessful, and pursuant to the Court's ruling on the SEC's motion in limine, the allocution was neither read nor shown to the jury. See Tr. 469:22-472:5.

■ At the time, Mr. Payton's foregoing trial testimony appeared to the Court to be materially inconsistent with his plea colloquy statements.[5] In particular, Mr. Payton had stated at his plea hearing that "[o]ne

---

5. Unlike earlier perjury statutes, such as 18 U.S.C. § 1621, the new perjury statute, 18 U.S.C. § 1623, does not require the Government, in indicting a defendant for perjury, to specify which declaration is false, as long as "(1) each declaration was material to the point in question, and (2) each declaration was made within the period of the statute of limitations for the offense charged under this section." 18 U.S.C. § 1623(c); see United States v. Housand, 550 F.2d 818, 823 & n. 9 (2d Cir.1977) ("The recent false declarations statute provides that where the defendant under oath has made two declarations which are inconsistent to the degree that one of them is necessarily false, the indictment need not specify which declaration is false, and mere proof of the contradiction is enough for conviction, 18 U.S.C. § 1623(c)").

of the brokers at the brokerage firm told me his roommate told him that IBM would soon be acquiring a software company called SPSS at a specific price per share"; that "I understood that once this acquisition was announced, the price of SPSS shares would rise dramatically"; and that "[g]iven the specificity of the information, it was apparent that this information was obtained in breach of fiduciary duty." Payton Plea Tr. 28:13-25. Later on in the plea hearing, Mr. Payton further stated that "[Tom Conradt] specified that the company, IBM, would be the likely acquirer of SPSS—sorry, that he spoke to IBM about specifically purchasing SPSS at a particular share price." Payton Plea Tr. 35:22-25.

These statements seemed plainly at odds with such statements in Mr. Payton's trial testimony as, for example, that before he traded, he was "not sure" if he "even at that point recognized, you know, SPSS per se," Tr. 459:6-7; that it was a "rumor" that SPSS was the target of a buyout, Tr. 459:20-22; and that he "did not remember the precise detail" that Tom Conradt's roommate had told Mr. Conradt that IBM would soon be acquiring SPSS, Tr. 467:23-468:2.

■■■ Accordingly, the Court felt obliged to pursue further the possibility of perjury, even without reference to the special circumstances presented by Fed. R. Evid. 410. A trial court is not a mere "bump on a log," United States v. Pisani, 773 F.2d 397, 403 (2d Cir.1985), when it comes to combatting the perversion by possible perjury of a court proceeding's truth-finding function. To the contrary, there is a long history of courts, in appropriate cases, referring possible perjury to prosecutors for investigation or of supporting such a remedy.[6] For the same reasons, a court, in circumstances in which the court believes that the truth-finding processes are being abused, is fully authorized to make inquiries outside of the presence of the jury. As one trial court explained, it conducted an evidentiary hearing outside the presence of the jury partially "to address its ethical obligation to determine whether a reasonable basis existed to believe that [a trial witness] had committed the crime of perjury." In re Actos, 2014 WL 2624943, at *4.[7]

This Court therefore dismissed the jury and, outside the presence of the jury, be-

---

6. See, e.g., The Reno, 61 F.2d 966, 968 (2d Cir.1932); United States v. Comiskey, 460 F.2d 1293, 1294 (7th Cir.1972). For some recent examples of perjury referrals, see Ades v. 57th St. Laser Cosmetica, LLC, No. 11-cv-8800, 2013 WL 2449185, at *13 (S.D.N.Y. June 6, 2013); Mackler Prods., Inc. v. Turtle Bay Apparel Corp., 92-cv-5745, 1997 WL 269505, at *4 (S.D.N.Y. May 21, 1997), vacated on other grounds sub nom. Mackler Prods., Inc. v. Cohen, 146 F.3d 126 (2d Cir. 1998); Neal v. LaRiva, 765 F.3d 788, 791 (7th Cir.2014). One court explained that it "interprets the Code of Conduct for United States Judges—known as the judicial canons of ethics—as requiring this Court, should it develop a reasonable basis for believing that the criminal act of perjury has occurred, to refer the matter to the United States Attorney's Office for handling by that representative of the Administrative Branch of the United States Government." In re Actos (Pioglitazone) Products

Liab. Litig., No. 12-cv-00 64, 2014 WL 2624943, at *5 (W.D.La. June 11, 2014).

7. See also Li v. Canarozzi, 142 F.3d 83, 85 (2d Cir.1998) (describing trial court's inquiry, outside the presence of the jury, into whether a witness had given truthful testimony at his deposition, for the purposes of determining whether the witness was unavailable and whether his deposition should be admitted into evidence); Barnett v. Norman, 782 F.3d 417, 423 (9th Cir.2015) (when a witness refuses to testify, a trial judge "can take a recess and inquire outside the presence of the jury whether something is impeding truthful testimony."); cf. Harris v. Steelweld Equip. Co., 869 F.2d 396, 402 (8th Cir.1989)(rejecting the claim that the district court prejudiced their case by "ordering the jury out while the court lectured [a witness] in regard to lying in federal court," since "the judge was trying to control the evidence and the witnesses in the courtroom and simply took the required corrective measure outside the presence of the

gan its own questioning of Mr. Payton. See Tr. 473:2-476:7. At the outset, the Court explained the purpose of the questioning, stating that the Court had an "independent, of course, obligation to make an inquiry out of the hearing of the jury if [it] think[s] perjury is occurring." Tr. 473:11-13. Only after the Court finished its line of questioning did Mr. Payton's counsel object.[8] The Court, while overruling his objection, did thereupon allow Mr. Payton's counsel to put his own questions to his client. See Tr. 477:1-12. In response to these questions-which raised issues about the circumstances under which Mr. Payton had made the statements in his plea allocution—the Court resumed its questioning of Mr. Payton (again outside the presence of the jury), see Tr. 477:15-478:10, 515:7-518:24, seeking to determine whether there was an innocent explanation for the seeming inconsistency.

Mr. Payton then offered two possible explanations for the apparent inconsistencies, and a third was later offered by his counsel. The first explanation was that Mr. Payton's memory of Mr. Conradt's statements to him about IBM's impending acquisition of SPSS was not as clear at trial as it had been on the day of his plea. See Tr. 474:5-9; 475:10-15. The Court finds this explanation unpersuasive and, indeed, itself bordering on the incredible. Mr. Payton pled guilty in November 2014 and testified at trial in February 2016. Mr. Payton told this Court that at his plea, he remembered that Mr. Conradt told him that IBM would acquire SPSS at a specific price per

share. See Tr. 475:12-15. Indeed, Mr. Payton explained that at the time of his plea, he "was confident" that his statements about what Mr. Conradt told him "were true." Tr. 474:5-6; see 473:14-19. Some fifteen months later, however, despite being focused on preparing for the trial,[9] Mr. Payton would have the Court believe that he was now unable to "remember Tom specifically telling [him] any specific price per share." Tr. 475:6-7. The mere passage of 15 months cannot plausibly account for such a glaring inconsistency.

Mr. Payton's second explanation for the inconsistencies was that his plea allocution was initially a written statement prepared by his attorneys, who made additions to the statement while the plea hearing was taking place. See Tr. 477:1-9; 478:1-10. In particular, Mr. Payton said he believed that notes passed to him by his counsel at the plea hearing related to his statement that "[o]ne of the brokers at the brokerage firm told me his roommate told him that IBM would soon be acquiring a software company called SPSS at a specific price per share, and that we should invest in this stock." Tr. 478:1-6; see 473:14-19. Mr. Payton also vaguely indicated that he remembered a Post-It note was written at the time of the allocution and "was also included." Tr. 478:8-10.

To explore this possibility, the Court, on February 29, 2016, while the jury was deliberating, held a hearing with Mr. Payton's former counsel, who had represented him at his plea.[10] Those counsel duly ap-

---

jury in order to correct the deliberate inconsistencies in the testimony of the witness.").

8. When Mr. Payton's counsel belatedly did object, he cited no authority for the proposition that the Court was barred from conducting an inquiry into possible perjury outside the presence of the jury, nor any other ground for his objection.

9. In their letter submitted after the trial, Mr. Payton's counsel noted that in the year following his plea, Mr. Payton "had the opportunity to review contemporaneous documents and spend numerous hours with counsel to figure out what precisely he remembered Conradt saying and when." Payton Post-Trial Letter at 4.

10. Mr. Payton's current counsel objected to this procedure, see Feb. 29 Tr. at 5:2-8, but

peared at that hearing and were represented by their own counsel. See Feb. 29 Tr. at 7:7-8:23. After explaining the context and purpose, the Court put to them the following questions: "During the court proceeding, did you hand a Post-it or some way or another make some change [to the written allocution]? If so, was it with respect to that sentence?[11] " Feb. 29 Tr. 14:7-9. Mr. Payton's former counsel stated that they had no memory of whether a Post-It note was handed to the defendant during the plea colloquy, but that they did recall that there was colloquy between them and their client during the course of the plea allocution, see Feb. 29 Tr. 22:4-13. However, after consultation with Mr. Payton and his current counsel, his former counsel invoked attorney-client privilege and work-product doctrine as to the contents of statements to Mr. Payton that appeared on any such Post-It or other note, as well as to the contents or production of any drafts of the written plea-allocution statement. See Feb. 29 Tr. 25:2-6. While rejecting the invocation of the work-product doctrine and expressing the belief that the attorney-client privilege might well have been waived by Mr. Payton's prior responses to the Court, the Court chose to uphold the invocation of the attorney-client privilege for the purposes at hand, without prejudice to the waiver issue being revisited by this or another court at some future time. See Feb. 29 Tr. 15:22-16:2, 17:14-16, 19-21, 25:7-13.

The Court draws no adverse inference from this invocation of attorney-client privilege. But the invocation means that there is no affirmative evidence, other than Mr. Payton's vague recollection about his attorneys' involvement in his allocution, to sug-gest that what Mr. Payton stated under oath at one of the most important proceedings of his life, his guilty plea, was not an accurate representation of his memory. The Court, therefore, has no basis upon which to infer that the inconsistencies between Mr. Payton's plea allocution and his trial testimony are a result of his former counsel's putting words in his mouth or anything remotely like that.

The Court thus turns to a third alleged explanation for the inconsistencies between Mr. Payton's plea allocution and his trial testimony—not an explanation that he offered himself but that was offered by his counsel in their post-trial letter. Mr. Payton's counsel asserts that Mr. Payton's allocution, when read as a whole, was itself somewhat equivocal on the points of alleged inconsistency with Mr. Payton's trial testimony. See Payton Post-Trial Letter at 3. For example, Mr. Payton testified at trial that he could not "definitively remember" whether he knew before trading that the information about IBM's acquisition of SPSS was inside information that was supposed to be kept confidential, see Tr. 484:9-14, despite having stated in his plea allocution that he "understood that this [information] was supposed to be kept confidential." Payton Plea Tr. 28:25-29:1. Mr. Payton's post-trial letter explains this apparent inconsistency by stating that "it is not entirely clear from the plea allocution that Mr. Payton had this understanding prior to, as opposed to after, trading." Payton Post-Trial Letter at 3.

The Court finds this interpretation of the plea allocution to be highly doubtful. It is true, as Mr. Payton's counsel points out, that in Mr. Payton's plea allocution, "I

did not cite any authority to support his objection.

11. "That sentence" referred to the following sentence in Mr. Payton's plea allocution: "One of the brokers at the brokerage firm told me his roommate told him that IBM would soon be acquiring a software company called SPSS at a specific price per share and that we should invest in this stock." Payton Plea Tr. 28:14-18; see Feb. 29 Tr. 13:24-14:4.

understood that this was inside information" technically follows " [a]fter the deal was announced." See Payton Plea Tr. 28:21-22; 28:25-29:2; Payton Post-Trial Letter at 3. However, the plea allocution casts Mr. Payton's understanding that the information was obtained in breach of fiduciary duty, and was supposed to be kept confidential, as a consequence of the "specificity of the information." See Payton Plea Tr. 28:23-29:1. The plea allocution also makes clear that Mr. Payton was aware of the specific information about IBM's acquisition of SPSS before he traded. See Payton Plea Tr. 28:14-22. The plain inference is that Mr. Payton was aware of the confidential nature of the information before he traded, and there is no basis for concluding, based on the plea allocution, that Mr. Payton's understanding was different between the times before and after he traded.

Moreover, Mr. Payton's counsel's interpretation of the plea allocution as to the confidentiality point does not explain other material inconsistencies in Mr. Payton's testimony. Notably, there was nothing equivocal about Mr. Payton's statement at his guilty plea allocution that Mr. Conradt "told me his roommate told him that IBM would soon be acquiring a software company called SPSS at a specific price per share," Payton Plea Tr. 28:15-17, or that "I understood that once this acquisition was announced, the price of SPSS shares would rise dramatically," Payton Plea Tr. 28:18-19. However, as explained supra, Mr. Payton gave materially inconsistent testimony on these subjects at trial. See Tr. 468:11-13, 18-19, 474:7-9, 459:20-23, 45 9:24-460:2. In sum, the Court is not persuaded that Mr. Payton's plea allocution was equivocal on key points of inconsistency between the plea and his trial testimony.

Nevertheless, the Court recognizes some countervailing reasons not to refer Mr. Payton to the U.S. Attorney's Office for a possible perjury prosecution. First, since the areas of inconsistency were, in the Court's view, significant to the SEC's case against Mr. Payton, the Court finds it likely that the jury would not have found Mr. Payton liable if it had fully credited his testimony at trial. However, the jury did find Mr. Payton liable, so in that respect any perjury by Mr. Payton that occurred in the trial did not ultimately undermine the workings of the legal process. See Cornielle, 171 F.3d at 751 ("many [untruthful statements in a civil trial] essentially are resolved by adverse jury verdicts, leaving for criminal prosecution those few instances where a witness' lie is so material to the truth-seeking function of a trial that the prosecutor (sometimes, upon the referral of the trial judge) elects to seek an indictment.").

Second, as a consequence of Mr. Payton's having been found liable, he faces substantial civil penalties. See SEC Damages Letter dated March 7, 2016, Dkt. 144; Payton Damages Letter dated March 14, 2016, Dkt. 147. So, in a rough sense, he will receive some adverse consequence from his seeming perjury.

Third, a Court should be very cautious about making such a referral and should do so only in exceptional cases, since, as this Court previously stated in another case, the threat of a perjury referral, if frequently invoked, might "have a chilling effect on civil litigants who wish to testify in suspicious circumstances." Antidote Int'l Films, Inc. v. Bloomsbury Pub., PLC, No. 06–cv–6114, 2007 WL 1834839, at *2 (S.D.N.Y. June 26, 2007).

Fourth, because a formal perjury referral from a federal judge carries heavy weight, it may impede the prosecution from exercising its own independent judgment as to whether perjury has occurred or whether, even if it has, criminal prosecution is appropriate. This last consider-

ation takes on a special meaning in this case, given that the plaintiff, the SEC, is itself a government entity. It may be unrealistic to believe that prevailing private parties to a civil suit will refer matters to the U.S. Attorney's Office for possible perjury prosecution or that, even if they do, that the U.S. Attorney's Office will pursue such an investigation. In the instant case, however, the plaintiff is a government agency that has frequently worked closely with the U.S. Attorney's Office. Indeed, this very case involved parallel civil and criminal suits. Nothing stops the SEC from asking the U.S. Attorney's Office to investigate whether Mr. Payton engaged in perjury, and it is to be expected that such a referral would be taken seriously.

Taking account of all these factors, and notwithstanding the seemingly glaring inconsistencies between Mr. Payton's plea allocution and his trial testimony, the Court is persuaded not to formally refer Mr. Payton to the U.S. Attorney's Office for a possible perjury prosecution. Whether the SEC will choose to make its own referral is left to that agency's discretion.

SO ORDERED.